# UNITED STATES *v.* INTERSTATE COMMERCE COMMISSION ET AL.

No. 330.   Argued March 2, 1949.—Decided June 20, 1949.

*Stanley M. Silverberg* and *David O. Mathews* argued the cause for the United States. With them on the brief were *Solicitor General Perlman, Assistant Attorney General Bergson* and *Philip Elman.*

*Daniel W. Knowlton* argued the cause and filed a brief for the Interstate Commerce Commission, appellee.

*Windsor F. Cousins* argued the cause for the Pennsylvania Railroad Co. et al., appellees. With him on the brief were *Hugh B. Cox, Robert C. Barnard, Charles P. Reynolds* and *Charles Clark.*

MR. JUSTICE BLACK delivered the opinion of the Court.

It is contended here that the United States as a shipper is barred from challenging in federal courts an Interstate Commerce Commission order which denies the Government a recovery in damages for exaction of an allegedly unlawful railroad rate. Other contentions if sustained would deny federal courts all power to entertain an action by any shipper challenging a Commission order denying damages to the shipper.

During the war, existing tariffs of many railroads embodied wharfage charges to compensate the railroads for moving goods from railroad cars to piers and from piers to railroad cars. When the United States took over certain piers at Norfolk, Virginia, it began to perform these wharfage services for itself and requested the railroads to make the United States an allowance for the expenses incurred in performing the services. The railroads refused to make an allowance. Upon this refusal the Government requested the railroads to perform the services themselves. The railroads refused to perform the services.

The United States filed with the Interstate Commerce Commission a complaint against the railroads charging that exaction of pay for unperformed services was unjust, unreasonable, discriminatory, excessive, and in violation of certain sections of the Interstate Commerce Act.[1] The

---

[1] 49 U. S. C. §§ 1 (5) (a), 1 (6), 2, 6 (8), 15 (13).

complaint asked the Commission to find the charges unlawful. Further relief asked, under the Interstate Commerce Act,[2] was that the Government be awarded damages (reparations) on account of the alleged unlawful exactions. The Commission found that the charges were not unjustly discriminatory, unreasonable, or otherwise in violation of the Act. Accordingly, the Commission denied reparations and ordered the complaint dismissed. *United States* v. *Aberdeen & Rockfish R. Co.,* 269 I. C. C. 141 (1947).

The United States brought this action in a United States District Court to set aside the Commission order. The complaint charged that the Commission's conclusions were not supported by its findings, that the findings were not supported by any substantial evidence, that the order was based on a misapplication of law and was "otherwise arbitrary, capricious and without support in and contrary to law and the evidence." The Interstate Commerce Commission was made a defendant. The United States was also made a defendant because of a statutory requirement that any action to set aside an order of the Interstate Commerce Commission "shall be brought . . . against the United States." 28 U. S. C. (1946 ed.) § 46, now § 2322. Railroads that collected the wharfage charges intervened as defendants under authority of 28 U. S. C. (1946 ed.) § 45a, now § 2323. The Attorney General appeared for the Government as both plaintiff and defendant. Without reaching the merits of the case, the District Court composed of three judges dismissed the cause on the theory that the Government could not maintain a suit against itself. The court also indicated its belief that a three-judge court was without jurisdiction

---

[2] 49 U. S. C. §§ 8, 9. The complaint also sought relief from future exactions, but prior to the Commission's final order the piers were returned to private ownership and this prayer was abandoned.

of the suit. 78 F. Supp. 580. The case is here on direct appeal under 28 U. S. C. (1946 ed.) § 47a, now § 1253.

In this Court the Commission and the railroad intervenor defendants support the District Court's dismissal for the reasons given by that court. Alternative reasons are also urged. We hold that the dismissal was error and that the case should have been considered on its merits.

*First.* There is much argument with citation of many cases to establish the long-recognized general principle that no person may sue himself. Properly understood the general principle is sound, for courts only adjudicate justiciable controversies. They do not engage in the academic pastime of rendering judgments in favor of persons against themselves. Thus a suit filed by John Smith against John Smith might present no case or controversy which courts could determine. But one person named John Smith might have a justiciable controversy with another John Smith. This illustrates that courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.

While this case is *United States* v. *United States, et al.,* it involves controversies of a type which are traditionally justiciable. The basic question is whether railroads have illegally exacted sums of money from the United States. Unless barred by statute, the Government is not less entitled than any other shipper to invoke administrative and judicial protection. To collect the alleged illegal exactions from the railroads the United States instituted proceedings before the Interstate Commerce Commission. In pursuit of the same objective the Government challenged the legality of the Commission's action. This suit therefore is a step in proceedings to settle who is legally entitled to sums of money, the Government or the railroads. The order if valid would defeat the Government's claim to that

money. But the Government charged that the order was issued arbitrarily and without substantial evidence. This charge alone would be enough to present a justiciable controversy. *Chicago Junction Case,* 264 U. S. 258, 262–266. Consequently, the established principle that a person cannot create a justiciable controversy against himself has no application here.

*Second.* It is contended that the provisions of the Act making the Government a statutory defendant in court actions challenging Commission orders, show a congressional purpose to bar the Government from challenging such orders. Legislative history is cited in support of this contention. If the contention be accepted, Congress by making the Government a statutory defendant in such cases has deprived the United States as a shipper of powers of self-protection accorded all other shippers. We cannot agree that Congress intended to make it impossible for the Government to press a just claim which could be vindicated only by a court challenge of a Commission order. See *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 279.

In support of their contention that Congress did not intend for the Government to press its claims as a shipper, the Commission and railroads emphasize the anomaly of having the Attorney General appear on both sides of the same controversy. However anomalous, this situation results from the statutes defining the Attorney General's duties. The Interstate Commerce Act requires the Attorney General to appear for the Government as a statutory defendant in cases challenging Commission orders. 28 U. S. C. (1946 ed.) § 45a, now § 2323. The Attorney General is also under a statutory duty "to determine when the United States shall sue, to decide for what it shall sue, and to be responsible that such suits shall be brought in appropriate cases." *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 279. See also *United*

*States* v. *California*, 332 U. S. 19, 26–29. Nothing in the Interstate. Commerce Act indicates a congressional purpose to amend prior statutes which had imposed primary responsibility on the Attorney General to seek judicial. redress for the Government.

Although the formal appearance of the Attorney General for the Government as statutory defendant does create a surface anomaly, his representation of the Government as a shipper does not in any way prevent a full defense of the Commission's order. The Interstate Commerce Act contains adequate provisions for protection of Commission orders by the Commission and by the railroads when, as here, they are the real parties in interest. For, whether the Attorney General defends or not, the Commission and the railroads are authorized to interpose all defenses to the Government's charges and claims that can be interposed to charges and claims of other shippers. In this case the Commission and the railroads have availed themselves of this statutory authorization. They have vigorously defended the legality of the allowances and the validity of the Commission order at every stage of the litigation.

*Third.* 28 U. S. C. (1946 ed.) § 41 (28)[3] provides that "The district courts shall have original jurisdiction . Of cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission." The legal consequences of this order if upheld will finally relieve the railroad of any obligations to the Government on account of the alleged unlawful

[3] The substance of 28 U. S. C. § 41 (28) of the 1946 United States Code now appears as § 1336 of the 1948 Code. The provision for judicial review of Interstate Commerce Commission orders first appeared in 1910 in an Act creating the Commerce Court. 36 Stat. 539. Congress abolished the Commerce Court in 1913 and transferred to district courts the Commerce Court's jurisdiction to review Commission orders. Urgent Deficiencies Act, 38 Stat. 208, 219–220.

charges; the order thus falls squarely within the type made subject to judicial review by § 41 (28). *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 131–132, 142–143; *El Dorado Oil Works* v. *United States,* 328 U. S. 12, 18–19.

The Commission and the railroads contend, however, that § 9 of the Interstate Commerce Act, 49 U. S. C. § 9, bars the United States or any other shipper from judicial review of an order denying damages in reparation proceedings initiated before the Commission. Section 9 provides in part:

> "Any person or persons claiming to be damaged by any common carrier . . . may either make complaint to the commission . . . or may bring suit . . . for the recovery of the damages . . . in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

The contention of the Commission and the railroads as to § 9 is this. A shipper has an alternative. He may bring his action before the Commission or before the courts. But he must make an election. If he elects to "bring suit" in a court and is unsuccessful, he retains the customary right of appellate review. If he elects to "make complaint to" the Commission, as the Government did, and relief is denied, he is said to be barred by the statutory language of § 9 from seeking any judicial review of the Commission order. Under the contention the order is final and not reviewable by any court even though entered arbitrarily, without substantial supporting evidence, and in defiance of law.

Such a sweeping contention for administrative finality is out of harmony with the general legislative pattern of

administrative and judicial relationships.[4]  See, e. g.,
*Shields* v. *Utah I. C. R. Co.,* 305 U. S. 177, 181–185;
*Stark* v. *Wickard,* 321 U. S. 288, 307–310.  And this Court
has consistently held Commission orders reviewable upon
charges that the Commission had exceeded its lawful
powers.  See, e. g., *Interstate Commerce Commission* v.
*Louisville & N. R. Co.,* 227 U. S. 88, 91–93; *Chicago Junc-
tion Case,* 264 U. S. 258, 266.  The language of § 9
does not suggest an abandonment of these consistent hold-
ings.  It does suggest that a shipper who elects either
to "make complaint to" the Commission or to "bring
suit" in a court is thereafter precluded from initiating a
§ 9 proceeding in the other.  It may therefore be as-
sumed that after a shipper has elected to initiate a Com-
mission proceeding for damages he could not later initiate
an original district court action for the same damages.
But forfeiture of the right to *initiate* his claim in the
court under § 9 is one thing; forfeiture of his right under
28 U. S. C. (1946 ed.) § 41 (28), now § 1336, to obtain
judicial review of an unlawful Commission order is an-
other.  Section 9's language controls the forum in which
reparation claims may be begun and tried to judgment or
order; it does not purport to give complete finality to a
court judgment or to a Commission order merely because

---

[4] The Administrative Procedure Act, 60 Stat. 237, 243, 5 U. S. C.
§§ 1001 (d), 1009, provides:

"Sec. 2. . . . (d) Order and Adjudication.—'Order' means the
whole or any part of the final disposition (whether affirmative, nega-
tive, injunctive, or declaratory in form) of any agency in any matter
other than rule making but including licensing.  'Adjudication' means
agency process for the formulation of an order."

"Sec. 10. Except so far as (1) statutes preclude judicial review
or (2) agency action is by law committed to agency discretion—

"(a) Right of review.—Any person suffering legal wrong because
of any agency action, or adversely affected or aggrieved by such
action within the meaning of any relevant statute, shall be entitled
to judicial review thereof."

a shipper elected to proceed in one forum rather than the other. So we can find nothing in the language of § 9 that bars a court from reviewing a reparation order upon allegations by a shipper that the order was entered in defiance of standards established by Congress to determine when reparations are due.

Furthermore, the section's careful provision for judicial protection of railroads against improper Commission awards argues against interpretation of the same section to deny to shippers any judicial review whatever. Under the suggested interpretation a shipper could recover nothing if the Commission decided against him. But a Commission award favorable to a shipper is not final or binding upon the railroad. Such an award "only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. . . . Nor does it in any wise work a denial of due process of law." *Meeker & Co.* v. *Lehigh Valley R. Co.*, 236 U. S. 412, 430. And see *Pennsylvania R. Co.* v. *Weber,* 257 U. S. 85, 90–91. It hardly seems possible to find from the language of § 9 a congressional intent to guarantee railroads complete judicial review of adverse reparation orders while denying shippers any judicial review at all.

What we have said would dispose of the § 9 contention but for the argument of the Commission and the railroads that their suggested interpretation of the section is required by this Court's holding in *Standard Oil Co.* v. *United States,* 283 U. S. 235, and other cases that followed it. In that case the Standard Oil Co., a shipper, was denied the right to judicial review of a Commission order denying reparations. Judicial review was denied on four grounds: (1) The order in the *Standard Oil* case denying reparations was "negative" in form, and was therefore beyond judicial appraisal under the

"negative order" doctrine. This doctrine was wholly abandoned in *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125. (2) The decision in the *Standard Oil* case held that the Commission order was supported by substantial evidence and was not otherwise in violation of law. The Government's claim here is that this order cannot meet that test. (3) The third ground for denial of judicial review was that having elected to test its damage claim before the Commission, Standard was precluded from judicial review. (4) A three-judge court was an improper tribunal to adjudicate damage claims under § 9.

The *Standard Oil* interpretation of § 9 denying shippers any judicial review was made by a court usually careful to protect against arbitrary or unlawful administrative action. And, as shown, the court there first satisfied itself that the Commission order was not the product of an unlawful exercise of power by the Commission. Furthermore, the "negative order" philosophy, then at its peak, clearly barred review of all orders denying reparations. Consequently, the *Standard Oil* § 9 interpretation barred judicial review of no class of Commission orders except orders already immune from such review under the "negative order" doctrine. The *Standard Oil* holding was thus clearly supported by and rooted in the now rejected "negative order" doctrine.[5]

Another reason for the Court's construction of § 9 in the *Standard Oil* case was that Standard's damage claim

---

[5] Mr. Justice Cardozo so treated the *Standard Oil* holding in *I. C. C.* v. *United States,* 289 U. S. 385, 388, a case decided prior to this Court's repudiation of the "negative order" doctrine. He there said that in denying reparations "the Commission speaks with finality. Its orders purely negative—negative in form and substance—are not subject to review by this court or any other." Authorities for this statement were "negative order" cases. These same cases were relied on by the court in a later case that referred with approval to the *Standard Oil* § 9 interpretation. *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500, 507–508.

could have been adjudicated by a district court since it involved no question as to reasonableness of rates that called for exercise of the Commission's primary jurisdiction. The importance of this factor was emphasized by this Court in applying the *Standard Oil* construction of § 9 in *Baltimore & O. R. Co.* v. *Brady,* 288 U. S. 448, 457–459. First pointing out that there was no question in that case "requiring the exercise of the Commission's administrative powers," the Court said:

"It is to be remembered that, by electing to call on the Commission for the determination of his damages, plaintiff waived his right to maintain an action at law upon his claim. But the carriers made no such election. Undoubtedly it was to the end that they be not denied the right of trial by jury that Congress saved their right to be heard in court upon the merits of claims asserted against them. The right of election given to a claimant reasonably may have been deemed an adequate ground for making the Commission's award final as to him."

And see *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500, 507–508.

Thus, a crucial support for the Court's holding in the *Standard Oil* and *Brady* cases was that the shippers in those cases could have commenced original § 9 actions in the district court. But it has been established doctrine since this Court's holding in *Texas & P. R. Co.* v. *Abilene Oil Co.,* 204 U. S. 426, that a shipper cannot file a § 9 proceeding in a district court where his claim for damages necessarily involves a question of "reasonableness" calling for exercise of the Commission's primary jurisdiction.[6] The Government's claim here does involve such a question of "reasonableness." For the allowances

---

[6] See cases collected in *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 139, n. 22, and *Armour & Co.* v. *Alton R. Co.,* 312 U. S. 195; *Skinner & Eddy Corp.* v. *United States,* 249 U. S. 557, 562.

exacted from the Government were authorized in the railroads' published tariffs and were therefore not unlawful unless "unreasonable." Consequently the Government here had no "right of election" between Commission and court that could be "deemed an adequate ground for making the Commission's award final . . . ." *Baltimore & O. R. Co.* v. *Brady, supra,* at 458.[7]

*Ashland Coal Co.* v. *United States,* 325 U. S. 840, is the only case in this Court that relied on the *Standard Oil* decision after we had abandoned the "negative order" doctrine. Cf. *Allison & Co.* v. *United States,* 296 U. S. 546. And it is doubtful if the shipper in the *Ashland Coal Co.* case could have sought reparations in a district court under the "primary jurisdiction" doctrine. In affirming without argument the judgment of a three-judge court in the *Ashland Coal Co.* case, this Court's *per curiam* opinion cited two pages of the *Standard Oil* opinion that support the interpretation of § 9 urged here by the Commission and railroads. It is a fair inference that the pages were cited for that interpretation although other grounds for the Court's decision also appear there. One such ground was that a three-judge court is an improper

---

[7] The Commission argues that § 9 does authorize a shipper to initiate damage claims in a district court even though the claim necessarily involves questions upon which the Commission's primary jurisdiction must be invoked. The railroads more cautiously say that such suits can be filed upon an initial showing by a shipper that it might work a hardship on a shipper for the court to refuse to entertain the case. Both contentions run counter to this Court's previous cases. Particular circumstances were held sufficient in one case to justify a court in staying further judicial proceedings to await Commission action. *Mitchell Coal Co.* v. *Pennsylvania R. Co.,* 230 U. S. 247, 266–267. The same course was followed in another case, over the Commission's objection, where the action was in assumpsit, and the administrative problem did not emerge until the case was in course of litigation. *Tank Car Corp.* v. *Terminal Co.,* 308 U. S. 422, 432.

tribunal for the review of such Commission orders. Another ground was that there was "nothing to suggest that the Commission acted arbitrarily or without evidence to support its conclusions, or that it transcended its constitutional or statutory powers." The three-judge district court in the *Ashland* case in sustaining the Commission order had also held that a three-judge court was not a proper tribunal and that the Commission order was supported by substantial evidence and was in accordance with law. *Ashland Coal & Ice Co.* v. *United States*, 61 F. Supp. 708, 713.

We cannot accept the *Ashland Coal Co. per curiam* holding nor the *Standard Oil* case on which it rested as requiring the interpretation of § 9 which the railroads and Commission here urge. Our acceptance of that interpretation would mean that a shipper who submitted to the Commission only a question of the reasonableness of rates could have an adverse order reviewed by a court, *Skinner & Eddy Corp.* v. *United States*, 249 U. S. 557, 562–563, while a shipper who asked for that administrative determination plus reparations could get no judicial review at all. *Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, *supra*, at 507–508. On any ground except the now discarded "negative order" doctrine, this would appear to be an unsupportable and totally illogical limitation of the congressional command for judicial review.[8] See *Chicago*

---

[8] The "negative order" doctrine was first adopted by this Court in *Procter & Gamble* v. *United States*, 225 U. S. 282, decided in 1912. A shipper there brought action in the Commerce Court to set aside a Commission order dismissing the shipper's complaint. The complaint was that the charges were unjust and unreasonable. The Commerce Court was asked to annul the Commission's order of dismissal, to enjoin future collection of the charges, and to require the railroads to repay sums alleged to have been wrongfully collected from the shipper. The Commerce Court reviewed the action of the Commission and on the merits declined to grant the shipper the re-

*Junction Case,* 264 U. S. 258, 269–270; *Southern R. Co.* v. *Tift,* 206 U. S. 428, 440. Accordingly we hold that § 9 does not impair the right of shippers to obtain judicial review of adverse Commission orders under § 41 (28) merely because the order is sought as a basis for reparations.

*Fourth.* For reasons already stated we hold that a Commission order dismissing a shipper's claim for dam-

---

quested relief. This Court held that this "negative" order was not reviewable at the instance of the shipper. The Court's ruling brought sharp criticism in Congress. Corrective legislation was proposed, exhaustive committee hearings were held, debate was taken to the floor of Congress. In spite of the strenuous efforts to get Congress to repudiate the "negative order" doctrine, Congress in 1913 declined to act. But in all of the congressional hearings and debates on the subject, the critics of the *Procter & Gamble* "negative order" rule urged without contradiction that repudiation of the "negative order" rule would afford shippers the same judicial review of reparation and other orders then afforded to railroads. Not once do we find the argument suggested that 49 U. S. C. § 9 would bar shippers from judicial review of adverse reparation orders by the Commission, although this section was at the time part of the original Interstate Commerce Act, enacted in 1887, more than a quarter of a century before this congressional consideration.

This Court nevertheless abandoned the "negative order" doctrine in 1938, and in doing so effectively overruled a host of prior decisions. See cases collected in footnote to Mr. Justice Butler's opinion in the *Rochester* case, 307 U. S. 146, 148. The effect of today's decision is merely to recognize that the *Standard Oil* doctrine, barring judicial review to shippers, cannot stand consistently with the *Rochester* case which itself overruled the *Procter & Gamble* and other "negative order" decisions. It was therefore the *Rochester* case, not today's decision, that overruled a line of cases and granted relief where Congress had declined to afford any. H. R. Rep. No. 1012, 62d Cong., 2d Sess. 1–4 (1912); Hearings before the subcommittee of the Senate Committee on Appropriations on H. R. 7898, 63d Cong., 1st Sess. 140–148 (1913); Hearings before the subcommittee of the Senate Committee on Appropriations on H. R. 7898, 63d Cong., 1st Sess. 305–343 (1913); Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 25596 and H. R. 25572, 62d Cong., 2d Sess. 1–298 (1912); 50 Cong. Rec. 4532–4537, 4542–4545 (1913).

ages under 49 U. S. C. § 9 is an "order" subject to challenge under 28 U. S. C. (1946 ed.) § 41 (28). The remaining question is whether a district court entertaining such a challenge shall be composed of one judge or three judges and whether the judgment of a district court in such a case can be appealed directly to this Court.

The Urgent Deficiencies Act from which § 41 (28) was derived contains provisions for a three-judge district court to hear and determine suits brought to set aside a Commission "order," and authorizes judgments rendered in such cases to be appealed directly to this Court.[9] For reasons now stated we hold that judicial review of an order denying reparations does not require a three-judge court.

The provisions of the Urgent Deficiencies Act here considered derive from a 1910 congressional enactment creating the Commerce Court, defining its powers and providing for review of its judgments.[10] That court was given jurisdiction of all actions to enjoin, set aside and modify Commission orders. Section 2 provided for direct appeals from the Commerce Court to the Supreme Court. The purpose of creating the Commerce Court with such direct appeals was expedition of final determination of the validity of certain types of Commission orders. This expedition was sought for orders of national or widespread interest, such, for example, as railroad rate orders. Congress saw the necessity for an accelerated appellate procedure to prevent railroads from nullifying the effect of such orders in prolonged litigation.[11] The Commerce Act itself indicated that the same expedition necessary in cases affecting the public generally was not

---

[9] 38 Stat. 208, 219, 220; 28 U. S. C. § 2325 (1948). See also 28 U. S. C. (1946 ed.) § 47.

[10] 36 Stat. 539.

[11] See President's Message to Congress, 45 Cong. Rec. 7567–7568 (1910).

necessary in other kinds of cases involving "local and isolated questions which arise in the ordinary courts." [12] The Act's first section excluded from the Commerce Court's jurisdiction power to enforce "any order of the Interstate Commerce Commission . . . for the payment of money." [13]

Provisions of the Urgent Deficiencies Act of 1913 abolished the Commerce Court and transferred its jurisdiction to district courts composed of three judges. In considering this Act Congress was urged to bear in mind the necessity for providing a forum that could expeditiously review Commission orders of widespread importance.[14] But in passing the 1913 Act Congress denied power to three-judge courts to enforce Commission orders for the payment of money.[15] And in a case not involving reparations this Court held that orders relating merely to the payment of money are not likely to be of sufficient public importance to justify use of the three-judge procedure. See *United States* v. *Griffin*, 303 U. S. 226, 233, 234–237. But cf. *El Dorado Oil Works* v. *United States*, 328 U. S. 12, 18–19; *United States* v. *Jones*, 336 U. S. 641, 647. The Urgent Deficiencies Act with 49 U. S. C. § 9, which requires enforcement of Commission reparation awards in one-judge courts, indicates the belief of Congress that such orders are not of sufficient public importance to justify the accelerated judicial review procedure.

---

[12] S. Rep. No. 355, 61st Cong., 2d Sess. 1–2 (1910).

[13] See *Procter & Gamble* v. *United States*, 225 U. S. 282; *Texas & P. R. Co.* v. *Abilene Oil Co.*, 204 U. S. 426.

[14] Hearings before the subcommittee of the Senate Committee on Appropriations on H. R. 7898, 63d Cong., 1st Sess. 293–299, 300 (1913).

[15] It is also significant that the new judicial code does not give a three-judge court jurisdiction to adjudicate the validity of commission orders "for the payment of money." 28 U. S. C. § 2321.

While the Government here does not seek enforcement of a Commission order for the payment of money, the root of the controversy concerns the payment of money damages under 49 U. S. C. §§ 8, 9. Had the Commission made an award to the Government it could have filed a civil suit to recover money damages under the provisions of 49 U. S. C. § 16 (2). That section provides that such a suit "shall proceed in all respects like other civil suits for damages . . ."—that is, before one district judge. And an appeal from a judgment in such a case goes to the Court of Appeals. The same one-judge trial and appeal procedure available for enforcement of an award order would appear to be an equally appropriate and adequate tribunal for adjudication of validity of a Commission order denying reparations. For actions to enforce Commission orders awarding reparation, and actions to challenge Commission orders denying reparations, basically involve the same parties, the same disputes, the same claims for money damages, and the same statutes. We think the orders in both instances should be reviewed in the same one-judge tribunal.

We have frequently pointed out the importance of limiting the three-judge court procedure within its expressly stated confines.[16] We are confident that in holding that one judge rather than three should entertain cases challenging Commission reparation orders we interpret the congressional expediting procedure and the Interstate Commerce Act in accordance with their basic purpose.

*Fifth.* There remains the question of the proper disposition of this case. Three judges heard it. This, however, is no reason for dismissal of the cause. See *Stain-*

---

[16] *United States* v. *Griffin, supra,* 234–237; *Ayrshire Corp.* v. *United States,* 331 U. S. 132, 136–137; *Stainback* v. *Mo-Hock Ke Lok Po,* 336 U. S. 368, 378, n. 19; *Phillips* v. *United States,* 312 U. S. 246, 250.

*back* v. *Mo Hock Ke Lok Po,* 336 U. S. 368, 381. If the allegations of the bill are true, the Commission's order cannot stand. *Chicago Junction Case,* 264 U. S. 258, 264–266. Since the District Court did not pass on the merits of the allegations of the complaint, the cause is remanded to it for that purpose.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE JACKSON and MR. JUSTICE BURTON join, dissenting.

Four times shippers have asked this Court to recognize the right to review orders of the Interstate Commerce Commission denying claims for reparations against carriers; four times the United States resisted the right to such judicial review; four times this Court sustained the United States and held that the courts were without jurisdiction to review orders of the Commission denying reparations. Twice the decisions followed full argument: *Standard Oil Co.* v. *United States,* 283 U. S. 235, in which the bar of the Interstate Commerce Act to such review was expounded, and *Brady* v. *United States,* 283 U. S. 804, which relied on the *Standard Oil* case decided only a few weeks before. Twice thereafter the dismissal by district courts, for want of jurisdiction, of attempts to review such reparation orders was summarily affirmed without argument, so definitively had the *Standard Oil* case settled the matter. *Allison & Co.* v. *United States,* 296 U. S. 546, affirming 12 F. Supp. 862; *Ashland Coal & Ice Co.* v. *United States,* 325 U. S. 840, affirming 61 F. Supp. 708, decided less than four years ago. In order to recover a money claim of its own, the Government in this case has suddenly shifted a position consistently maintained by it for nearly twenty years against all other shippers and urges the right to review an order denying reparations. Indeed, at the very same time that the Govern-

ment was arguing before the District Court for the District of Columbia for the right to review an order denying it reparations; the Government successfully resisted precisely the same argument by a private shipper in a suit in the District Court for the Eastern District of Michigan. *Great Lakes Steel Corp.* v. *United States,* 81 F. Supp. 450. And the Government did so on the basis of the controlling series of cases in this Court decided on grounds which we are now asked to disregard.[1]

We are vouchsafed no explanation for the fact that the United States should have urged four times upon this Court, and contemporaneously with these proceedings in another district court, that an order resulting from a reparation proceeding before the Interstate Commerce Commission is not reviewable, and yet seeks review in this instance. The only explanation that lies on the surface is that in all the other cases the United States was resisting the claims of private shippers, while in this case the Government itself is the shipper. No doubt enlightenment sometimes comes through self-interest. But this Court's construction of the Interstate Commerce Act, long matured in a series of cases, ought not to shift with a shift in the Government's interest. The Interstate Commerce Commission rightly protests against it. To yield to the Government's new contention is not only to reverse a settled course of decision. To do so is to mutilate the whole scheme of the Interstate Commerce

---

[1] Compare Brief for United States and Interstate Commerce Commission, pp. 7–22, *Great Lakes Steel Corp.* v. *United States,* 81 F. Supp. 450, with Brief for United States, pp. 14–39, *United States* v. *Interstate Commerce Commission,* 78 F. Supp. 780. Since the argument of this case the *Great Lakes Steel* case has been brought here on appeal, No. 749, this Term, and the Government has acknowledged the conflict. See Motion to Defer Consideration of the Statement of Jurisdiction, *Great Lakes Steel Corp.* v. *United States,* No. 749, this Term.

Act by disregarding the distribution of authority Congress saw fit to make between the Commission and the courts for the enforcement of that Act.

One would suppose that four uniform decisions of this Court, rendered after thorough consideration of a statutory scheme, constitute such a body of law as not to be overruled, wholly apart from any argument that this Court's construction of legislation is confirmed by Congress by reenactment without change. The Transportation Act of 1940 [2] reenacted the relevant provisions of the Interstate Commerce Act after this Court had ruled three times that a shipper who has unsuccessfully asked the Commission for damages is bound by its determination and cannot thereafter have another go at it in the courts. The construction which these decisions have made should be adhered to not only because the precise issue has already been decided by this Court but because the Interstate Commerce Act requires it. "When judicial review is available and under what circumstances, are questions (apart from whatever requirements the Constitution may make in certain situations) that depend on the particular Congressional enactment under which judicial review is authorized." *Labor Board* v. *Cheney California Lumber Co.,* 327 U. S. 385, 388. It will hardly be suggested that the Constitution requires judicial review of a reparation order by the Commission. Such a notion is precluded by *Cary* v. *Curtis,* 3 How. 236, and the whole unfolding of administrative law during the hundred years since that decision. This is not one of those exceptional cases where "the sanction afforded by judicial proceedings" is implied in the guaranty of due process of law. *Ng Fung Ho* v. *White,* 259 U. S. 276, 284–5. Therefore, it is as true of the Interstate Commerce Act as it is of the National Labor Relations Act, that "Congress was entitled to determine what remedy it would provide, the way

[2] 54 Stat. 899, 49 U. S. C. § 1 *et seq.*

that remedy should be sought, the extent to which it should be afforded, and the means by which it should be made effective." Mr. Chief Justice Hughes, speaking for the Court in *Amalgamated Utility Workers* v. *Consolidated Edison Co.*, 309 U. S. 261, 264.

In the reticulated scheme for enforcement of the new rights and obligations created by the Interstate Commerce Act, Congress clearly indicated where the judiciary comes in and where the judiciary is to keep out. More particularly, Congress has provided in detail for judicial review in certain aspects of reparation claims that come before the Commission; it has afforded an alternative procedure as between Commission and courts in some instances; it has specifically precluded resort to judicial review where the shipper has chosen resort to the Commission. If the scheme of legislation that Congress has devised is to be respected, judicial review of the Commission's order denying it reparations is not open to the Government.

A summary of what this case involves should precede a detailed analysis of the Act, so far as relevant to its disposition.

At the time this controversy arose it had long been the practice for railroads reaching Atlantic ports to absorb the cost of wharfage and handling services furnished by them for goods destined for shipment overseas. This applied only to services rendered on so-called public wharves; excluding, that is, services so required on wharves operated by a shipper himself. The wharves in question were piers owned by the Government, but leased by it for commercial peacetime operations as public terminal facilities of the railroads. Up to June 15, 1942, these piers were operated by the Transport Trading and Terminal Corporation, as agent of the defendant railroads. War conditions made it necessary for the Government to cancel its leases with the Terminal Corporation and, on June 15, 1942, it took over the operation of these piers for the movement of

military freight, almost entirely outbound. The railroads refused allowances for the cost of services which they had theretofore absorbed, and declined a later request of the Army to perform the handling services because the Army, not the railroads, controlled the piers.

Claiming to be damaged by the refusal of the railroads to grant allowances for the Government's handling of its goods on its own piers, when it excluded the Terminal Corporation and took over the piers, the Government initiated these proceedings before the Commission for reparations under § 8 of the Interstate Commerce Act.[3] It filed its complaint under §§ 9 and 13 of that Act.[4] Claiming that the rates under the existing tariffs were unjust and unreasonable, and that it was discriminated against because other shippers were furnished wharfage and handling services which it performed at its own expense, the Government sought relief against continuance of alleged violations of §§ 1 (5) (a), 1 (6), and 15 (13) of the Interstate Commerce Act. The complaint was sustained by Division 2, with one Commissioner dissenting. *United States* v. *Aberdeen & Rockfish R. Co.,* 263 I. C. C. 303. The full Commission reversed the findings of Division 2 and ordered the complaint dismissed, four Commissioners dissenting. 264 I. C. C. 683. On reargument the full Commission adhered to its findings, five Commissioners dissenting.[5]

---

[3] 24 Stat. 382, as amended, 49 U. S. C. § 8.

[4] 24 Stat. 382, as amended, 49 U. S. C. § 9, 24 Stat. 383, as amended, 49 U. S. C. § 13.

[5] It held that the rates for export applied only when the wharves were public, which these wharves were not. The Commission also pointed out that the railroads had made other concessions to the Government; that the rates charged, together with a reasonable allowance for the services not provided, were still below the upper limits of reasonableness; that the wharfage charges had been absorbed because of competitive conditions. 264 I. C. C. 683, 269 I. C. C. 141.

269 I. C. C. 141. At the time of its final report, it was assumed that the operation of the piers reverted to the situation existing prior to June 15, 1942, so that the purpose of the proceeding before the Commission was deemed to be for reparations only. 269 I. C. C. at 147.

Invoking the procedure of the Urgent Deficiencies Act of 1913, the Government then sought to set aside the order of the Commission dismissing the Government's complaint. (Act of October 22, 1913, 38 Stat. 219–21, now 28 U. S. C. §§ 1253, 1336, 2101, 2284, 2321–2325.) A duly constituted district court, with three judges sitting, found itself without jurisdiction to review the Commission's order. 78 F. Supp. 580. This judgment should be affirmed, insofar as it held that an order of the Commission denying damages by way of reparations in proceedings brought before the Commission is not reviewable in the courts.

To ascertain whether an order of the Interstate Commerce Commission is open to judicial review, it should rigorously be borne in mind that jurisdiction to review such an order must have been conferred by Congress. To assume that an order of the Commission for which reviewing power is not conferred, is presumably reviewable by the courts is to start with the answer of the problem to be solved. Unless Congress has chosen to give the courts oversight of a determination by the Commission, the courts have not the power of oversight where, as here, the Constitution does not require it. If Congress has made no grant of power to courts to review the Commission's order denying a claim for reparation, and, in fact, has explicitly withheld resort to the courts after such denial by the Commission, it is wholly immaterial that as to other types of orders the right to review has been given to the courts, or that a determination by the Commission closely related to reparations, but not in fact a claim for damages, does not bar access to the courts.

When dealing with the Interstate Commerce Act we are dealing not with an episodic bit of legislation to which the general jurisdiction of the federal courts presumably applies. We are dealing with the oldest regulatory scheme which, by successive amendments and enlargements, established a comprehensive, self-contained regime both of administration and adjudication. The scheme as a whole ought not to be dislocated to meet the exigencies of a particular situation.

*First.* Judicial review of an order by the Commission dismissing a complaint for reparations has heretofore been urged exclusively on the basis of the Urgent Deficiencies Act. The jurisdiction of the district court in this case was invoked under that Act. This is the sole basis of jurisdiction urged by the Government here in its comprehensive brief and argument, and the Court rejects it. It rightly rejects it. But the compelling considerations for this rejection demand a further analysis of the structure and details of the jurisdictional provisions relating to orders of the Interstate Commerce Commission. Such analysis is essential to lay bare the equally compelling considerations against jurisdiction under the general equity powers of the district courts.

Section 8 of the Interstate Commerce Act created a civil liability of carriers for damages caused by violation of the new obligations imposed by that Act. In the absence of specific remedies, it would be fair to assume that these new rights were enforceable in the district courts under their general jurisdiction over suits "arising under any Act of Congress regulating commerce." 28 U. S. C. § 1337. But the Interstate Commerce Act did not stop with a mere declaration of liability. It defined a specific course of procedure; it particularized the remedies available to those to whom new rights were given and the way in which they were to be pursued. "In such a case the specification of one remedy normally excludes

another." *Switchmen's Union of North America v. National Mediation Board*, 320 U. S. 297, 301. For charging more than the tariff rate or charging a discriminatory rate, the Act provides alternative procedures set forth in detail in § 9. These are the relevant provisions: "any person or persons claiming to be damaged by any common carrier . . . may either make complaint to the Commission as hereinafter provided for, or may bring suit . . . in any district . . . court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt." 24 Stat. 379, 382, as amended, 49 U. S. C. § 9. With qualifications shortly to be noted, a suit begun in a district court follows the course of any other action there. On the other hand, if the shipper prefers to pursue the alternative course—the administrative route—to obtain damages for a violation of the Act, he files his complaint with the Commission.

As to a proceeding before the Commission, whether for damages or for a rate adjustment, § 13 defines the procedure;[6] the role of the courts in relation to the Commission's orders is defined by §§ 16 [7] and 17 (9).[8] Section 16 fixes the time for filing a complaint either in the courts or before the Commission; it also provides for the enforcement of an order awarding damages, limiting the time within which such an action must be brought, and stating the effect to be given to the Commission's award. Since 1940, the provisions of the Urgent Deficiencies Act of 1913 (38 Stat. 219–21), conferring on the district courts the jurisdiction in suits on orders of the Commission theretofore vested in the abolished Commerce Court, were

---

[6] 24 Stat. 383, as amended, 49 U. S. C. § 13.

[7] 24 Stat. 384, as amended, 49 U. S. C. § 16.

[8] 54 Stat. 916, 49 U. S. C. § 17 (9).

incorporated in § 17 (9). A few years previous the procedural provisions of the Urgent Deficiencies Act of 1913 became part of Title 28 of the United States Code.

By this scheme of law enforcement, carefully apportioned between Commission and courts, Congress has provided that insofar as any order, provided it is not one for money damages, can be enjoined, set aside and enforced it must be under the provisions dealing with suits to enforce, enjoin, or set aside orders of the Commission, "but not otherwise." 54 Stat. 916, 49 U. S. C. § 17 (9). By this limitation Congress has made it as clear as language can that if an order is not within § 16, because not one for money damages, if review is available, it must be under § 17. If the Commission action does not fall within § 16 or § 17, it is not reviewable at all. Orders under § 17 are reviewable only as provided for in the Urgent Deficiencies Act. But the Urgent Deficiencies Act furnishes only procedural details; it merely defines the method of review and not the kinds of cases for which review is available. It did not make reviewable actions previously unreviewable. 50 Cong. Rec. 4536, 4542. Cf. *Standard Oil Co.* v. *United States,* 283 U. S. 235, 241; *United States* v. *Jones,* 336 U. S. 641, 647–8. It is the body of law constituting the Interstate Commerce Act which determines whether and under what circumstances review may be had. A long course of judicial application in a field of law, fairly to be called technical, has gradually ascertained from the context of the comprehensive scheme of legislation the kind and the characteristics of orders that are reviewable.

If the dismissal of a reparation complaint is not within the phrase "any order" in § 17 (9) of the Interstate Commerce Act, it is also not within the "any order" phrase of the sections of Title 28 (§ 41 (28) and § 46 of the 1946 ed., and §§ 1336 and 2324 of the present Title 28), which embody the review provisions formerly in

the Urgent Deficiencies Act of 1913, which provisions in turn were taken from the Commerce Court Act. 36 Stat. 539. Although § 2321 of Title 28 of the Revised Code requires that "any order" of the Interstate Commerce Commission other than one "for the payment of money" should be reviewed according to the procedure under the provisions providing for a three-judge court, it is clear that "there are many orders of the Commission which are not judicially reviewable under the provision now incorporated in the Urgent Deficiencies Act." *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, 309.

In the *Los Angeles & S. L. R. Co.* case it was held that the district court had no jurisdiction to review a final valuation order—neither by virtue of the Urgent Deficiencies Act, nor under its general equity powers. This result was reached partly because of want of equity, but also because it was found, upon full consideration, that not every order of the Commission is "any order" within the jurisdictional authorization of the Interstate Commerce Act and the applicable provisions of the Urgent Deficiencies Act. So, also, an order refusing to increase the allowance for railroad mail compensation is not reviewable under the Urgent Deficiencies Act. *United States* v. *Griffin,* 303 U. S. 226; see also *Great Northern R. Co.* v. *United States,* 277 U. S. 172. The ground given in the *Griffin* case was that, although there was a case or controversy and final action, this type of order was not within the Urgent Deficiencies Act—and this, as we reaffirmed the other day, quite apart from the obsolete "negative order" doctrine. *United States* v. *Jones,* 336 U. S. 641, 647. Finally—and it ought to be decisive—on four occasions this Court has held that the Commission's refusal to award reparations, when the shipper, as here, proceeded under § 13 of the Act, is not reviewable. *Standard Oil Co.* v. *United States,* 283 U. S. 235; *Brady* v. *Interstate Commerce Comm'n,* 43 F. 2d 847, *affirmed per curiam*

*after argument, Brady* v. *United States,* 283 U. S. 804; *Allison & Co.* v. *United States,* 12 F. Supp. 862, *affirmed per curiam,* 296 U. S. 546; *Ashland Coal & Ice Co.* v. *United States,* 61 F. Supp. 708, *affirmed per curiam,* 325 U. S. 840. These decisions were based upon the fact that the Interstate Commerce Act precludes review by the courts when the shipper had first sought damages before the Commission.

The extraordinary consequences of jurisdiction under the Urgent Deficiencies Act—direct appeal to this Court, a district court of three judges, precedence over other cases on both trial and appeal—were to come into play in strictly limited situations. These can be fairly summarized as covering only the kinds of administrative orders which generally are "of public importance because of the widespread effect of the decisions" rendered by the Commission. *United States* v. *Griffin, supra,* 303 U. S. at 233. The reparation orders here involved, as is true of all reparation orders, since the shipper must show actual damages, concern only the shipper and the common carrier which charged the rate. An underlying legal issue which may be of wider public importance can, of course, be adjudicated in a way which permits judicial review. Thus, an order dealing with future rates is reviewable under the provisions for a three-judge court.

But there is another reason why reparation orders are not reviewable under the three-judge court provisions. Section 17, incorporating the Urgent Deficiencies' mode of review, is not concerned with reparation claims but with a wholly different matter. Reparation claims have been specifically dealt with in other sections of the Act, and, to the extent that review was intended, it is specifically provided for. By the original Act, orders for the payment of money were enforceable in equity. Interstate Commerce Act of 1887, § 16, 24 Stat. 379, 384–385.

On the suggestion that this was a denial of the common carrier's right to trial by jury guaranteed by the Seventh Amendment, see 19 Cong. Rec. 5149–50, Congress promptly provided that a successful shipper before the Commission had to sue at law on his award. 25 Stat. 855, 859–60, as amended, 49 U. S. C. § 16 (2). But there was no occasion for court review of a rate order because the original Interstate Commerce Act, while giving the shipper a right to damage for past violations, did not give the Commission rate-making authority. *Interstate Commerce Commission* v. *Cincinnati, N. O. & T. Pac. R. Co.,* 167 U. S. 479. The rate-making power was first conferred by the Hepburn Act of 1906. 34 Stat. 584, 586–587. For the review of such rate orders Congress enacted what is now § 17 (9). Then, for the first time, the courts were given jurisdiction over a suit "to enjoin, set aside, annul, or suspend any order or requirement of the Commission," and "jurisdiction to hear and determine such suits" was thereby vested in the circuit court of the district in which the common carrier was located. 34 Stat. 592; see H. R. Rep. No. 591, 59th Cong., 1st Sess. 4–5 (1906); H. R. Rep. No. 4093, 58th Cong., 3d Sess. 2, 5 (1905); *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, 309.

In 1910, this identical jurisdiction was transferred from the circuit courts and conferred upon the newly created Commerce Court, but it was expressly provided: "Nothing contained in this Act shall be construed as enlarging the jurisdiction now possessed by the circuit courts of the United States . . . ." 36 Stat. 539. This provision was inserted in the legislation so "that the creation of this court shall not be construed as giving to the Commerce Court any greater jurisdiction than is now possessed by the circuit courts of the United States over similar matters." H. R. Rep. No. 923, 61st Cong., 2d Sess. 7 (1910); see S. Rep. No. 355, 61st Cong., 2d Sess.

4, Pt. 2, 4–5 (1910); see S. Doc. No. 606, Vol. 54, 61st Cong., 2d Sess. 2 (1910). By this legislation of 1910, Congress merely provided for a shift of jurisdiction, from the old circuit courts to the new centralized Commerce Court, and not an enlargement of jurisdiction. When in 1913 the Commerce Court was abolished the same jurisdiction was revested in the district courts, the circuit courts having been abolished in the meantime: "the jurisdiction vested in said Commerce Court . . . [was] transferred to and vested in the several district courts of the United States." 38 Stat. 219. Indisputably Congress did not make reviewable orders which could not have been reviewed by the Commerce Court.[9]

Therefore, even putting to one side § 9, the dismissal of the reparation complaint was clearly not within the words "any order" in § 17 (9): (1) if it were within § 17 (9) it would be reviewable only by a three-judge court,

---

[9] There was no Committee Report on this legislation; it was added to an appropriation bill. See 50 Cong. Rec. 4527–8. Mr. Fitzgerald, the sponsor of the amendment, said that its sole purpose was to abolish the Commerce Court and make provision for the litigation over which that court had jurisdiction. "It does not give any new right to any parties." 50 Cong. Rec. 4532, 4536, 4542. There was an attempt to enlarge the review provision so as to give shippers review where previously it did not exist, but this amendment was defeated after debate. 50 Cong. Rec. 4532, 4543–44. It was said: "The legislation contained in this bill simply abolishes a court that ought never to have been created and vests the jurisdiction which it now exercises in the district courts of the United States. That is all of it, and that is all there ought to be of it. There ought not to be any attempt to enact substantive law in this bill. There ought not to be any attempt to have an increase or decrease of the powers of the commission, and there ought not to be any attempt to increase or decrease the jurisdiction of the district courts over that of the Commerce Court. The only reason why the district courts are designated instead of the circuit courts is that the circuit courts have been abolished since the Commerce Court was created." 50 Cong. Rec. 4536.

but that reviewing device is not applicable to reparation claims; (2) reparation claims are not within § 17 (9) because they have been treated by a different scheme throughout the history of the Act. If review is to be found within the Act, it must be because of provisions other than those in § 17 (9).

*Second.* The only other provision in the Interstate Commerce Act which affords judicial review of an order is § 16. That section, however, comes into force only when an award for damages is made. Rejection by the Commission of a money claim is outside the express terms of that section and not within what can fairly be implied from any language in it. A general argument of fairness is made that since this section provides for court review when an award is made where the carrier loses, the shipper is entitled to review when the carrier wins. Leaving aside, temporarily, the fact that what Congress has written in § 9 forecloses court review, to yield to such an inference in favor of a shipper whose claim is denied raises insuperable difficulties once we leave the text and scheme of the Act and go at large as to court review. Thus there would be no limit on the time in which review of the Commission's dismissal of the reparation claim could be brought, whereas § 16 fixes a time limit for suits against the carrier on awards by the Commission. 43 Stat. 633, as amended, 49 U. S. C. § 16 (3) (f). This is just one of the obstructions if we are to imply court review of orders disallowing reparation claims because Congress has seen fit to allow suits on orders granting an award. In other respects the Court would have to legislate for Congress. What effect is to be given to the Commission's finding? If the shipper receives an award of damages and sues the carrier thereon, § 16 (2) provides that the Commission's findings are *prima facie* evidence. 41 Stat. 491, as amended, 49 U. S. C. § 16 (2). Are we to create the same rule judicially, though Congress

has not done so, when the shipper fails before the Commission? May the shipper introduce new evidence in the district court? When the shipper sues the common carrier, the Commission's action in making an award "cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury." *Meeker & Co.* v. *Lehigh Valley R. Co.,* 236 U. S. 412, 430. But if the unsuccessful shipper can save up evidence until he gets in court, the advantages of a Commission hearing are destroyed. What will be the scope of the Court's jurisdiction? Would the district court determine only liability, or also the amount to be recovered, or only that the Commission acted without justification in fact or contrary to law? The answer to none of these questions can be found in § 16. Yet, one would suppose, if review in this situation is to be derived from § 16, some guides for its exercise should also be found in that section, considering the particularities with which it defines review in the instances authorizing court action. Therefore, this Court has held: "Section 16 (2) does not permit suit in the absence of an award, and if the Commission denies him relief, a claimant is remediless." *Baltimore & Ohio R. Co.* v. *Brady,* 288 U. S. 448, 458.

Money damages are part of the regulatory scheme. *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.,* 230 U. S. 247, 258. But while the Commission may determine that rates for the future be reduced, it is not required to award damages for the higher rates in the past. Thus it is not at all strange that its action be not subject to court review where the shipper has failed to persuade the Commission to award damages. *Baltimore & Ohio R. Co.* v. *Brady,* 288 U. S. 448, 458. Especially is this true when Congress has provided for an alternative procedure whereby the shipper would have been able to go to court. Therefore, even without any explicit provision it would be a reasonable inference that Congress did not intend

.to grant a review where the shipper has decided to seek his damages before the Commission.

Even though Congress provided alternate methods of securing damages, and authorized court review when the Commission sustained a money claim, but not when it denied such a claim, Congress did not leave merely to rational inference that upon denial of a money award by the Commission, the shipper could not again try his luck in court. By § 9 Congress gave the shipper his choice of forum: he could ask for damages either from the Commission or a court, but could "not have the right to pursue both of said remedies"; he "must in each case elect which one of the two methods of procedure herein provided for he . . . will adopt." 24 Stat. 382, as amended, 49 U. S. C. § 9. If the shipper asks the Commission to award him damages and it goes against him, Congress has barred review of the denial or revision of the amount of the award. *Baltimore & O. R. Co.* v. *Brady,* 288 U. S. 448, 458–59. Since Congress gave the shipper the alternative of administrative or judicial relief, there can be no question but that Congress was constitutionally free to make final the administrative choice.

*Third.* Since access to court review of an order denying reparations was barred by the Interstate Commerce Act, such review is not available under the general jurisdiction of the district courts. 28 U. S. C. § 1337. It has never been suggested, during some sixty years of active litigation over this problem, that for review of such an order resort may be had to a court of equity outside the framework of the Interstate Commerce Act. Even the Government does not now suggest it, and naturally so. Due regard for the explicit provisions of the Act precludes it. And for these reasons:

(1) The specific terms of § 17 (9) which alone give reviewing power to the courts, save in cases where the carrier has been held to owe money, do so "under those pro-

visions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise." 54 Stat. 916, 49 U. S. C. § 17 (9). It is obvious that review would be "otherwise" if the unsuccessful shipper be permitted to bring an action under 28 U. S. C. § 1337. This reason exists independently of the fact that § 9 also prohibits court action after an attempt to recover damages is made before the Commission. It is also independent of the fact that provisions of Title 28 do not make reviewable orders for which the Interstate Commerce Act does not provide review.

(2) Because of these provisions, review of reparation claims differs from the situation in *Shields* v. *Utah I. C. R. Co.,* 305 U. S. 177. There the Court was not confronted with an enactment which said that if a person sought the Commission's aid he could not thereafter go to court. The *Shields* case is inapposite on another ground. By determining that a certain railroad was subject to the Interstate Commerce Act, the Commission placed the railroad under the active hazards of criminal sanctions. Equity was invoked for one of its ancient functions of staying a multiplicity of criminal prosecutions to avoid irreparable harm. See 305 U. S. at 183, and *Switchmen's Union of North America* v. *National Mediation Board,* 320 U. S. 297, 306. Here there is not the remotest ground for appeal to equity. It is merely a matter of dollars and cents—not the hazards of criminal prosecution—and an insistence on having two modes of recovering money damages when Congress has given shippers the choice of one or the other. There is a total absence of any of the traditional grounds for equitable relief. Cf. *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, 314–5.

Nor is review permitted under § 1336 of Title 28 (1948), if it is determined that the type of order involved is not of the nature calling for a three-judge court. The

Government relied on the special scheme of the Urgent Deficiencies Act as incorporated in the Interstate Commerce Act conferring jurisdiction to review orders of the Commission. This scheme requires review by a three-judge court. The Court rejects that claim on the ground that a reparation order is not the type of order so reviewable. Instead the Court finds jurisdiction in the district court to entertain a petition to review an order of the Commission denying reparation in § 41 (28) of Title 28 (1946 ed.), now § 1336. But jurisdiction under § 41 (28) carries also the requirement of a three-judge court. See §§ 41–47, now c. 157 of Title 28 of the Revised Code. No jurisdiction can be derived from § 41 (28) of Title 28 unless the order is of the type that is reviewable by a three-judge court. To reject the latter is necessarily to hold that no jurisdiction of the district court is derivable from § 41 (28) of Title 28, now § 1336.[10]

---

[10] In *United States* v. *Griffin,* 303 U. S. 226, it was held that because the type of order there involved was not the type reviewable by a three-judge court, the phrase the "district courts shall have jurisdiction 'of cases brought to enjoin, set aside, annul or suspend in whole or in part any order of the Interstate Commerce Commission'," did not confer jurisdiction on the district court. 303 U. S. at 227–228. The quoted words are the provision in the Urgent Deficiencies Act and are precisely the same provision that was carried over to § 41 (28). When we had this general problem here the other day in *United States* v. *Jones,* 336 U. S. 641, it was not suggested that there was jurisdiction to review an order of the Commission under § 41 (28), now § 1336 of Title 28. Instead, the Court agreed with the *Griffin* case that the order there involved was not of a type calling for a three-judge court and therefore that the jurisdictional provisions of § 41 (28), now § 1336 of Title 28, were not applicable. The Court significantly referred to the provisions of § 41 (6), now § 1339 of Title 28, the section giving general jurisdiction over suits arising under the postal laws, as the only possible source of jurisdiction. In the context of this case the comparable provision is § 41 (8), now § 1337. The only reason why the Court now seeks to warp the whole structure of Title 28 rather than to rely on the only section

Moreover, a suit filed under the jurisdiction of § 41 (28) of Title 28 is one against the United States with the Interstate Commerce Commission as a party only if it chooses to intervene. 28 U. S. C. §§ 2322, 2323. Congressional consent is required to authorize such a suit and congressional consent has been authorized only under the conditions requisite for a three-judge court proceeding for which this Court finds no jurisdiction, 28 U. S. C. §§ 2321–2325. On the basis of the result in this case the decision below in the *Great Lakes Steel* case, No. 749 this Term, must of course be reversed. And so this Court would direct the allowance of a suit against the United States, although Congress has not given consent thereto. The only possible escape from this conclusion is that jurisdiction is to be denied when a private shipper seeks to go into court after the Commission has dismissed his complaint for damages, as in the *Great Lakes Steel* case, but jurisdiction somehow or other should be acknowledged when the Government is the shipper. The defense of sovereign immunity, moreover, cannot be avoided by directing that the suit proceed only against the Interstate Commerce Commission. There is no claim that the Commission acted unconstitutionally, or that it proceeded under an unconstitutional statute, or that it acted beyond the authority conferred by a valid statute. It merely acted within the scope of its authority and made a determination, as it was legally bound to do, based upon the law and the facts. The difficulty of

which conceivably gives jurisdiction to a one-judge court is in order to escape the embarrassing fact that such a suit would be squarely in the face of § 9 of the Interstate Commerce Act. Of course even the procedure adopted is in the face of § 9 of the Interstate Commerce Act as interpreted in four previous decisions of the Court. But reliance on § 41 (8), now § 1337, would at least have the virtue of only mutilating one Act—that is, the Interstate Commerce Act— rather than both that Act and § 41 (28) of Title 28 (1946 ed.), now § 1336 and c. 157 of Title 28 of the Revised Code.

sovereign immunity forcibly demonstrates again why a method of court review cannot be found outside the provisions of the Interstate Commerce Act.

*Fourth.* We now turn to § 9. The language leaves no room for doubt. But it is now urged (though the Government has not so argued in the four decisions that went against private shippers) that where the damage claim was based on other than a mere arithmetical overcharge, the election afforded by § 9 is illusory. This is so, it is argued, because when complaint is made that rates were unfair, prejudicial or unreasonable, the doctrine of *Texas & Pac. R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, is brought into operation. It is said that the Government never had an opportunity to go into court until the Commission dismissed its complaint. Sufficient respect is given to § 9, so the argument runs, by reading it to bar "initiating" another action in the court after it has failed before the Commission, not to reviewing the Commission's action. So to argue is to rewrite what Congress has written. Congress did not bar "initiating"; it barred "the right to pursue." The Court concedes that § 9 is a bar when a shipper could have gone in the first instance to the courts. This was so ruled in *Baltimore & O. R. Co.* v. *Brady,* 288 U. S. 448. But what language affords a basis for a distinction when a determination of a transportation issue must be made by the Commission before the case can proceed to judgment? Moreover, the result of the Court's decision is to make the Commission's decision final in those instances where the Commission is acting purely judicially—merely a matter of applying the law to the facts—but not final when the Commission, acting in the realm of its administrative expertness, found a practice legal, and therefore denied damages. Adjudication and settled practice before the Commission likewise disprove this discovery that the choice given by Congress in § 9 is a sham.

The Commission must often pass on the legality of a particular practice of a carrier; such proceedings may serve as the basis for reparations. Under Part I of the Transportation Act, relating to rail carriers, the shipper may ask the Commission for a declaration that a practice · has been illegal and base a claim of damages on such illegality under § 8 of the Act. His other course is to secure a Commission determination only as to the illegality of the practice and not ask for an award, reserving the claim of damages for court action. This may be done in one of two ways. He may begin by filing his suit in court and ask the court to hold the case until he has obtained an administrative determination from the Commission.[11] There is no jurisdictional bar to such a procedure. In *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.*, 204 U. S. 426, the Court said the case should be dismissed; but preoccupation was with the necessity for prior administrative determination, not with whether there was jurisdiction in the sense of power to hold the case until there had been a Commission determination. Cases—decided after the *Abilene* case—have clearly rec-

---

[11] For the period since April 28, 1948, although there have been no instances in which the shipper has asked for a determination of the legality of a practice under Part I of the Act, in a complaint which also stated that a court action was being held in abeyance, there have been thirteen instances where complaints were filed before the Commission asking only for a determination of the legality of a practice because the complainant there was the defendant in a civil action in the courts. Since January, 1948, there have been five proceedings under Part II of the Act in which the shipper first instituted suit in the courts and then asked that the suit be held in abeyance until the Commission made a determination as to the legality of a particular practice. It should be pointed out that under Part II of the Act the Commission has no power to award damages; the doctrine of primary jurisdiction, however, is nevertheless applicable. *Bell Potato Chip Co. v. Aberdeen Truck Line*, 43 M. C. C. 337, 342–343.

ognized that there is jurisdiction to hold the case, and this procedure has been suggested in a number of them.[12] *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.,* 230 U. S. 247, 267; *Morrisdale Coal Co.* v. *Pennsylvania R. Co.,* 230 U. S. 304, 314–5; see *Smith* v. *Hoboken R. Co.,* 328 U. S. 123, 133; *Thompson* v. *Texas Mexican R. Co.,*

---

[12] The *El Dorado Terminal Co.* litigation did not involve a claim by a shipper for recovery of an overcharge by a carrier. Therefore, the decisions in *General American Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 U. S. 422, and *El Dorado Oil Works* v. *United States,* 328 U. S. 12, did not involve the statutory scheme relating to reparations. The cases have no bearing on the problem here—namely the jurisdictional requirements of § 9 in the context of the Interstate Commerce Act. The *El Dorado* litigation was an ordinary action on a contract. Entangled, however, in the proper construction of that contract was the ascertainment of a transportation fact, which, with due regard to the *Abilene* doctrine, made prior determination by the Interstate Commerce Commission appropriate. To that end it was ruled, in the first *El Dorado* case, that the action in the District Court should be held for such administrative determination. *General American Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 U. S. 422. That ruling does establish that simply because a prior determination by the Interstate Commerce Commission is required before a litigation can proceed to judgment does not deprive a district court of jurisdiction. This circumstance merely calls for the suspension of the exercise of jurisdiction until the appropriate fact is established by the Interstate Commerce Commission and then introduced in evidence in the pending court case, instead of being established independently in court, as is usually the case. "While we rejected the Commission's contention that the District Court had no jurisdiction to hear the case, we accepted its contention that determination of the validity of the challenged past practices was for the Commission." *El Dorado Oil Works* v. *United States,* 328 U. S. 12, 17. The order made by the Interstate Commerce Commission in response to the requirement of the first *El Dorado* case was not an order of dismissal in a reparation suit. Procedurally it did not make very much difference, therefore, whether this order of the Interstate Commerce Commission should have been entered in the pending litigation or was allowed to be considered in a new proceeding before the District Court. As a matter of procedural elegance it was more appropriate

328 U. S. 134, 151; see also *Bell Potato Chip Co.* v. *Aberdeen Truck Line,* 43 M. C. C. 337, 343.

The other method open to a shipper who desires to avail himself of the court remedy given by § 9 is to initiate proceedings before the Commission and to ask merely for a declaration regarding the legality of a past practice, but not for damages. This course is manifested by the complaints before the Commission, asking merely for a declaration without any *ad damnum.* For the period between July, 1947, and February, 1949, 46 such cases were filed under Part I of the Act. Under Part II, 22 complaints have been filed since January 1, 1948, requesting such a declaration as to the legality of a practice.[13]

---

for it to have formed part of the then pending litigation which was suspended precisely for the purpose of obtaining such an order.

In *Armour & Co.* v. *Alton R. Co.,* 312 U. S. 195, the essential question was whether a particular issue could be determined by the court or, in conformity with the *Abilene* doctrine, required Commission determination. The preoccupation of the case was with that issue. After holding that the doctrine of the *Abilene* case was applicable, the Court affirmed the judgment below requiring a ruling from the Interstate Commerce Commission, without considering whether there was jurisdiction in the sense of power to entertain but hold the case.

[13] These figures are not given to imply that in every instance, or even in most instances, Commission action is followed by a suit in the court for damages. Their sole purpose is to show that, by not seeking damages from the Commission, a complainant leaves himself free, under § 9, to go to the courts.

The Commission prefers that the shipper first file a suit in the court before asking the Commission for a declaration. This procedure has the advantage of preventing the statute of limitations from running on the shipper while awaiting Commission decision. Also, "In circumstances such as described, it is apparent that precautions should be taken to prevent the filing of frivolous or moot complaints. Without attempting at this time to devise a precise rule, we think it pertinent to point out that, generally speaking, adversary proceedings involving past unreasonableness, unjust discrimination,

The Government thus had a real choice. *Terminal
Warehouse Co.* v. *Pennsylvania R. Co.*, 297 U. S. 500,
507–8. But, having first sought the advantages of a
Commission award, it foreclosed itself from pursuing a
judicial remedy when its expectations failed. A double
remedy which Congress denied, this Court ought not to
grant. The Government "had a choice . . . between a
remedy at the hands of the Commission and a remedy
by suit, but by express provision of the statute it could
not have them both." *Terminal Warehouse Co.* v. *Pennsylvania R. Co., supra,* p. 508.

The conclusion reached by a reading of the statute
is reenforced by the adjudicated cases. In *Standard Oil
Co.* v. *United States,* 283 U. S. 235, three distinct grounds
were given for affirming the district court's dismissal for
want of jurisdiction of a suit to review an order of the
Commission dismissing a claim for damages. One reason
was that the order was "a negative order"; that reason has
been displaced by *Rochester Telephone Corp.* v. *United
States,* 307 U. S. 125. But the *Standard Oil* decision
was left intact by the *Rochester* decision, for the opinion
in that case explicitly pointed out that "the main basis"
of the *Standard Oil* decision "was not the 'negative order' doctrine but [that] the statutory scheme dealing
with reparations" precluded review of an order denying
money damages. 307 U. S. at p. 140, n. 23. The "stat-

---

or undue prejudice under part II should not be brought before us
prior to the institution of a suit in court in which damages are
sought predicated upon the unlawfulness alleged in the complaint.
The complaint should show that such suit has been brought within
the period allowed by the applicable statute of limitations. There
may be other situations in which we should exercise this jurisdiction. In this connection, it may be noted that it is a recognized
practice to hold in abeyance court proceedings pending the determination by the Commission of administrative questions." *Bell Potato Chip Co.* v. *Aberdeen Truck Line,* 43 M. C. C. 337, 343.

utory scheme" was thus defined in the *Standard Oil* case: "Having elected to proceed and having proceeded to a determination before the Commission, appellant was, by force of this provision [§ 9], precluded from seeking reparation upon the same claims by the alternative . method of procedure." 283 U. S. at 241; see also Mr. Justice Cardozo for the Court in *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500, 507–8. The Standard Oil Company as a shipper was precisely in the same situation as the United States in this case; the United States pursued the same course in this case as did the Standard Oil Company. The Standard Oil Company was not "initiating" an action in the district court but was seeking judicial review of the Commission's action, and this is precisely what the United States is doing in this case. The only difference between the *Standard Oil* case and this case is that in the earlier case the Standard Oil Company was the plaintiff, and in this case it is the Government. What the Court said in the *Standard Oil* case is equally applicable here. "It is of no importance that the adjudication sought is to take the form of a direction to the Commission to grant the prayer of the complaints filed before that body, etc., instead of a plenary judgment to the same end, for the prayer in that form is nothing less than an attempt to avoid the statute by indirection." 283 U. S. at p. 241.

In view of the fact that the *Rochester* case expressly saved that phase of the *Standard Oil* decision which is decisive of the problem before us now—"the statutory scheme dealing with reparations"—the Court's holding that the *Rochester* case impliedly overruled the *Standard Oil* case means of course that to this extent the Court today overrules the *Rochester* case, not that the *Rochester* case had overruled the *Standard Oil* case, wholly apart from the fact that the *Standard Oil* decision was the

basis of a decision long after the *Rochester* case.[14] *Ashland Coal & Ice Co.* v. *United States,* 325 U. S. 840.

And to what end these dislocations of so many decisions? We have been vouchsafed no considerations of policy, no revealed injustice flowing from the construction thus far placed upon the reparations provision of the Interstate Commerce Act, no difficulties in its ad-

---

[14] No decision of this Court has ever expressly or impliedly overruled the decision in the *Standard Oil* case. Least of all can it be said that *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, overruled the case, for the opinion with great care stated that the *Standard Oil* case was not overruled in its holding that orders dismissing a claim for reparations were not reviewable because of § 9 of the Interstate Commerce Act. See 307 U. S. at p. 140, n. 23. The Court there did only what the Court the other day did in *United States* v. *Jones,* 336 U. S. 641, 647–8, that is, it decided that for reasons wholly unrelated to the "negative order" doctrine an order of the Commission was not reviewable. If anything, the conclusion in the *Standard Oil* case was reinforced by the *Rochester* decision in that it was reaffirmed by the very decision that put the "negative order" doctrine and decisions dealing with it under the strictest scrutiny. That examination revealed that only one case out of the whole series of cases examined was really determined by the "negative order" doctrine. That was the only case the Court overruled. And even Mr. Justice Butler, who filed a separate opinion, did not say that other cases were being overruled. He objected, essentially, to their reexamination. He said: "The case presents no debatable question as to the jurisdiction of the district court. A statement of the facts alleged conclusively shows that in purpose, terms and effect the final order constitutes not mere determination or declaration but affirmative commands. There is no occasion to review earlier decisions dealing with affirmative and negative administrative orders and obviously none to overrule any of them or to repudiate or impair the doctrine they establish." *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 146, 147–48. That the *Rochester* case did not overrule *Standard Oil* is conclusively proved by the fact that this Court relied on that case less than four years ago to affirm a judgment dismissing a petition to review an order dismissing a claim for reparation. *Ashland Coal & Ice Co.* v. *United States,* 325 U. S. 840.

ministration, no disclosure of new materials for the proper construction of an old statute. And the current of settled judicial construction as well as administrative practice is now reversed against the vigorous protest of the agency charged with the administration of the law although only a week ago we greatly relied on administrative practice as the basis of judicial interpretation.

The result reached in the *Standard Oil* case was not limited to controversies which did not involve the "primary jurisdiction" doctrine. The district court in that case did assume *arguendo* that the issue involved nothing which required administrative determination before it addressed itself to the basic jurisdictional question. See *Standard Oil Co. v. United States,* 41 F. 2d 836. On appeal, however, this Court did not confine in any way the bar imposed by § 9 to resort to a district court after an unsuccessful resort to the Commission for reparations. It read § 9 as it was written, as a provision for a choice of tribunals so that, if damages are sought from the Commission and denied by it, the courts are closed to a further consideration of such a claim.

The suggestion at this late date that the election so specifically defined by § 9 applies only to those instances in which no need for Commission determination of transportation issues may be required is completely dispelled by *Brady v. United States,* 283 U. S. 804. In the *Brady* case, damages were based on the claim that the carrier's practices were unjust, unreasonable and unduly prejudicial—the exact grounds urged in this case. The Commission refused to award reparations in the amount claimed by Brady and the shipper brought precisely the same kind of suit that the United States as shipper brought here. Brady argued that since the controversy was within the Commission's so-called "primary jurisdiction," he never had the choice of proceeding in court rather than

going to the Commission. The district court dismissed his suit for want of jurisdiction to review the action of the Commission and this Court sustained that denial of jurisdiction. It did so on the basis of the *Standard Oil* decision which had been rendered a month before, for the *Standard Oil* case, as did the *Brady* case, and as does this case, involved questions which, as such, required preliminary. Commission determination.

The scope of the *Standard Oil* and *Brady* cases is made unambiguously clear by reliance on them for the decision in *Allison & Co.* v. *United States,* 296 U. S. 546, 664, and *Ashland Coal & Ice Co.* v. *United States,* 325 U. S. 840. In each case issues were involved which indubitably fell under the requirement of the "primary jurisdiction" doctrine. In each of these cases the shipper relied on the claim that his case was distinguishable from the *Standard Oil* and the *Brady* cases. The same distinctions which are now advanced by the Government were then advanced by the shipper but resisted by the Government. The Government then rightly insisted that the *Standard Oil* and the *Brady* cases could not be restricted to situations where the "primary jurisdiction" doctrine was inoperative and that the decision in those cases—that § 9 is unqualified in precluding resort to judicial review in all cases where damages had first been denied by the Commission—was compelled by a proper construction of § 9. This position of the Government was considered so incontestable that the Court deemed oral argument needless and granted the Government's motion to affirm. The Government's interest has changed, but not the force of its position when it was without self-interest.

I would affirm.