Charles A. WAITE and Elmer J. Carroll, a partnership doing business as C. A. Waite Company, Pittsburgh, Pennsylvania; and Harold T. Henry and Eugene Brandeis, sole stockholders in a former corporation known as American Swedo Iron Corporation, Danville, Pennsylvania, Plaintiffs,

v.

UNITED STATES of America, Defendant

and

Interstate Commerce Commission, Chicago, Burlington & Quincy Railroad Company, et al., Intervening Defendants.

Civ. A. No. 15258.

United States District Court
W. D. Pennsylvania.

March 27, 1958.

Henry W. Wick, Jr., Pittsburgh, Pa., for plaintiffs.

B. Franklin Taylor, Jr., U. S. Atty., Interstate Commerce Commission, Washington, D. C., Edward R. Gustafson, James A. Gillen, Chicago, Ill., Wallace D. Stewart, Pittsburgh, Pa., for defendant and intervening defendants.

WILLSON, District Judge.

This action is brought by plaintiffs under Section 17(9) of the Interstate Commerce Act, 49 U.S.C.A. § 17(9), to set aside orders of the Interstate Commerce Commission entered June 24, 1955 and December 19, 1955 in its Docket No. 31478, American Swedo Iron Corporation, et al. v. Chicago, Burlington & Quincy Railroad Company, et al., insofar as the orders dismissed plaintiffs' reparation claim for alleged unreasonable rates paid on carload shipments of steel billets shipped during 1951 and 1952 from Minnequa, Colorado, to destinations in Pennsylvania.

Plaintiffs Charles A. Waite and Elmer J. Carroll are partners, doing business under the name of C. A. Waite Company, having their principal place of business in the City of Pittsburgh, Pennsylvania, and are engaged in the business of marketing various iron and steel products, principally billets and other semi-finished steel. Plaintiff's Harold T. Henry and Eugene Brandeis during the years 1950–1955 were the sole stockholders in a former corporation named American Swedo Iron Corporation, having its principal place of business in Danville, Pennsylvania. This corporation was engaged in the manufacture and distribution of steel products of various types for a number of years, including the years 1951 and 1952. It was dissolved by action of the named stockholders in 1955, and all rights of the corporation and causes of action of said corporation have inured to the stockholders named.

The United States of America is the defendant, as provided by statute. By order of the court, the Interstate Commerce Commission and the following named railroads were permitted to intervene as party defendants: Chicago, Burlington & Quincy Railroad Company; The Colorado and Southern Railway Company; The Colorado & Wyoming Railway Company; the Denver and Rio Grande Western Railroad Company; Missouri Pacific Railroad Company, Guy A. Thompson, Trustee; New York Central Railroad Company; The Pennsylvania Railroad Company; The Pittsburgh & Lake Erie Railroad Company; Terminal Railroad Association of St. Louis; and Litchfield and Madison Railway Company.

Plaintiffs, in connection with their business, purchased and caused to be shipped sixty-seven carload shipments of steel billets in 1951 from the Colorado Fuel and Iron Corporation, Minnequa, Colorado, to Pittsburgh, Economy, McKees Rocks, and Avis, Pennsylvania, via the lines of the intervening defendant rail carriers. The billets in question were sizes of semi-finished steel in various lengths, from 6 to 35 feet, with rec-

tangular dimensions of 2½ inches to 4¼ inches. Billets are manufactured from steel ingots; billets are a semi-finished product and must be reheated for conversion into a more finished product. The billets were purchased F.O.B. Minnequa, Colorado, for prices ranging for $68 to $75 a net ton. Twenty-one shipments averaging 97,517 pounds, 43.-53 gross tons, per car moved to the American Swedo Iron Company at Avis, Pennsylvania in the period between February 24 and July 20, 1951; forty-six shipments averaging 114,843 pounds, 51.27 gross tons, per car were shipped to C. A. Waite Company at either Pittsburgh, Economy or McKees Rocks, Pennsylvania, during the period between March 1 and June 9, 1951.

Before the Commission plaintiffs alleged that the rates charged on the steel billets were unjust and unreasonable and in violation of Section 1 of the Interstate Commerce Act. The railroads denied the allegations, and the Interstate Commerce Commission ordered modified procedure so that the evidence was presented through verified statements by Harold T. Henry, President, American Swedo Iron Company, C. A. Waite, Partner, C. A. Waite Company and C. Peyton Collins, Transportation Specialist. Defendants' reply to the Commission presented testimony of C. E. Larsen, General Freight Agent of the Chicago, Burlington & Quincy Railroad Company. Plaintiffs filed a reply, presenting rebuttal testimony through Mr. Collins and Mr. Waite.

The factual evidence before the Commission on the part of the defendants was presented in Mr. Larsen's affidavit. The Commission's record in the case has been certified as part of the record in this court.

In accordance with Commission procedure, the case was assigned to an examiner. In his report, the examiner proposed that the Commission find that the rates were unreasonable to the extent they exceeded rates on coiled rods, minimum weight per carload 56,000 pounds. He further proposed that the plaintiffs were damaged by the amount of differ-

ence between the charges paid and those which would be accrued at the basis found reasonable and that the plaintiffs were entitled to reparation because of the unreasonable rates charged for billets.

Exceptions were filed by defendants to the examiner's report. Division 2 of the Commission reversed the examiner and dismissed the complaint by an order served July 11, 1955 upon a finding that the rates assessed were not shown to be unjust or unreasonable. Plaintiffs petitioned the entire Commission for reconsideration of this decision, but their petition was denied by an order entered December 19, 1955; so that plaintiffs have exhausted their remedies before the Commission.

Plaintiffs' position before this court is that the Commission decision should be annulled and set aside, since it is not supported by substantial evidence and is, in fact, contrary to the evidence and the applicable law. It is noticed that when the instant proceeding was first filed, a three-judge court was requested. It appeared, however, that plaintiffs challenged only the report and orders of the Commission insofar as they dismissed plaintiffs' reparation claim and that plaintiffs were no longer concerned about future rates. In their answers to the complaint, the Commission and intervening defendants denied that a three-judge court is required to set aside a Commission order denying reparations only and referred to United States v. Interstate Commerce Commission, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451. Subsequently, plaintiffs amended their complaint, striking out any reference to a three-judge court and the case therefore is regularly before this court as a one-judge court.

The parties are in agreement as to the scope of judicial review in an action of this kind. The Administrative Procedure Act, 5 U.S.C.A. § 1009(b) et seq., provides that the decision of the Commission in this case is part of the record before this court, including the findings and conclusions as well as the reasons or basis therefor upon all the material is-

sues of fact and law or discretion · presented on the record; and that the court is to hold unlawful and set aside the Commission findings and conclusions which are arbitrary, capricious, an abuse of discretion and which are unsupported by substantial evidence. Plaintiffs assert that their claim for reparation falls in the latter category in the sense that the Commission order is not supported by substantial evidence.

In their complaint before the Commission, plaintiffs requested that they be given relief by reducing the level of the billet rates to the level of the pig iron rates. However, after the examiner recommended that plaintiffs be given relief only to the level of coiled rod rate which was somewhat higher than the pig iron rate, plaintiffs were satisfied and in their petition for reconsideration they sought relief on the basis suggested by the examiner. This is the relief also which they now seek in this court.

From Minnequa, Colorado to Pittsburgh and Avis, Pennsylvania, the rate on coiled rods established September 1, 1949 and April 4, 1951, expressed in dollars and cents a gross ton runs from a minimum of $6.40 to $6.90 less than is the billet rate from Minnequa to Pittsburgh and Avis. This lower rate applies to coiled rods shipped from Minnequa to Buffalo, New York or Palmer, Massachusetts over the carrier lines. At $6.40 a ton, assuming the cars carry 100 tons each, on the sixty-seven cars shipped plaintiffs' claim for reparation, if allowed, amounts to approximately $43,180. Before the Commission and in this court, plaintiffs submit that it is unreasonable to apply higher rates on billets than on coiled rods since the former are in a less-advanced stage of manufacture, are less valuable and possess more desirable transportation characteristics.

Plaintiffs say that the only part of the Commission decision which makes specific findings on the actual issues raised are those set forth as follows, together with the conclusion dismissing the complaint:

"The sixth-class rating on billets has been in effect between points here concerned for about 25 years. The rates on coiled rods to Palmer and Buffalo were published to enable the shipper to distribute its excess production in eastern markets. At the time these rates were established the rail carriers anticipated a continuing and expanding movement, and the defendants claim that the rates are accomplishing their mission. In contrast, the considered shipments moved for the most part between February and August 1951; only three moved thereafter, and none after October 1952. The fact that reparation was awarded in two special-docket proceedings on shipments of coiled rods to Palmer and Buffalo does not establish that the assailed rates on billets to other destinations exceeded or exceed a reasonable maximum basis.

"We find that the assailed rates are not shown to have been or to be unjust or unreasonable. The complaint will be dismissed."

Plaintiffs have filed with the court a carefully prepared and logical brief on the issues presented. In their brief they say, " * * * how. could the railroads defend rates on billets which were higher than those on coiled rods, when coiled rods by every recognized test should have been assessed a higher freight rate?" This issue raised two controlling questions:

"A. How could the railroads defend a rate of $28.67 to Avis (1650 miles) and $26.88 to Pittsburgh (1440 miles) on billets, compared to a rate of $21.07 to Buffalo (1512 miles) and $23.52 to Palmer (1902 miles) on coiled rods?

"B. How could the railroads deny reparation to plaintiffs at least to the level of the coiled rod rates to Pittsburgh and Avis, when those same defendants had voluntarily paid reparations on shipments of coiled rods to Buffalo and Palmer?"

860

■ What has been said up to this point on the issues presented relates to the proceedings before the Commission and the issues raised by the plaintiffs in this court. The issues raised require the court to examine the decision made by the Commission to determine whether it was arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with the law and ultimately to determine whether or not it was supported by substantial evidence. The scope of judicial review is limited.

Many decisions have been cited by counsel as to the function of the court in reviewing an Interstate Commerce Commission decision. It seems to this court that the quoted excerpt from United States v. Pierce Auto Freight Lines, 327 U.S. 515, at page 535, 66 S.Ct. 687, at page 698, 90 L.Ed. 821, prescribes this court's duty. The language of the Supreme Court is:

> "We think the court misconceived not only the effects of the Commission's action in these cases but also its own function. It is not true, as the opinion stated, that '* * * the courts must in a litigated case, be the arbiters of the paramount public interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

It is the duty of this court to keep in mind that the Commission has found that the *"assailed rates are not shown to have been or to be unjust or unreasonable."* (Emphasis supplied.)

The statute law is (49 U.S.C.A. § 1 (5)) that the carriers charges "* * * *shall be just and reasonable, and every unjust and unreasonable charge for such, service or any part thereof is prohibited and declared to be unlawful."* (Emphasis supplied.)

■ Before this court the decision of the Commission carries a presumption of validity. Plaintiffs have the burden of showing that it is invalid because it is unjust and unreasonable in its consequences. Again the language of the Supreme Court in an Interstate Commerce Commission review case is pertinent. In I. C. C. v. Jersey City, 322 U.S. 503, at page 512, 64 S.Ct. 1129, at page 1134, 88 L.Ed. 1420, the court quotes the following from a previous decision:

> " '* * * Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288 [88 L.Ed. 333]. The Commission considered that it had, and we find no reason to doubt that it had, the evidence before it that was needful to the discharge of its duty to the public and to the regulated railroad. 'With that sort of evidence before them, rate experts of acknowledged ability and fairness, and each acting independently of the other, may not have reached identically the same conclusion. We do not know whether the results would have been approximately the same. For there is no possibility of . .

solving the question as though it were a mathematical problem to which there could only be one correct answer. Still there was in this mass of facts that out of which experts could have named a rate. The law makes the Commission's finding on such facts conclusive.' Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 550, 32 S.Ct. 108, 112, 56 L.Ed. 308.

" 'So long as there is warrant in the record for the judgment of the expert body it must stand. * * * "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." ' Rochester Telephone Corp. v. United States, 307 U.S. 125, 145–146, 59 S.Ct. 754, 764, 765, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 693, 694, 78 L.Ed. 1260."

Plaintiffs argue that the railroads are unable to defend a rate which is higher on billets than is the coiled rod rate from the western trunk line to official territory. Plaintiffs also pose the query, How can the railroads deny reparation to the plaintiffs at least to the level of coiled rod rates to Pittsburgh and Avis when the same defendants voluntarily paid reparations on shipments of coiled rods to Avis and Palmer? But regardless of the seeming logic in plaintiffs' argument taken step by step this court cannot find as a matter of law that the Commission's decision was unsupported by substantial evidence. As they must, to succeed in this court, plaintiffs must destroy the weight of the evidence presented to the Commission by the witness C. E. Larsen. It is noticed that the evidence before the Commission under its modified procedure was in the form of affidavits by the witnesses whose names have been mentioned. These affidavits present a picture of factual statements interspersed with argument and conclusions. The witnesses in general compare billets and coiled rods as to the various sizes and shapes, loading methods, the type of cars in which the shipments are carried, the market value and state of manufacture of billets and coiled rods, and that they are not damaged in transit. By the usual criteria used in rate determination, standing alone, billets would not carry a higher rate than coiled rods. But other factors apparently influenced the Commission in its determination that the assailed rates are not unreasonable.

Plaintiffs offered as their expert witness, C. Peyton Collins, a transportation specialist. He reviewed the history of the rates involved and made comparisons of the products shipped. To considerable extent his testimony is factual, but much of it is devoted to an attempt to persuade the Commission under the circumstances presented that the rates on plaintiffs' steel billets should have been lower than the rates on coiled rods. He drew the conclusion that the assailed rates were unreasonable.

It does not appear that the Commission or the railroads have any serious dispute as to the factual matters presented by plaintiffs. But in this connection, plaintiffs point to the Commission's finding which plaintiffs say was solely based on the evidence of C. E. Larsen that the coiled rod rates to Palmer and Buffalo were published to enable the shipper to distribute its excess production in eastern markets and also that the defendant carriers anticipated a continuing and expanding movement in coiled rods and that the railroads claim that the rates are accomplishing their purpose. Plaintiffs say that Larsen's statement contains not one word about the rates on coiled rods from Minnequa to Buffalo. An examination of the Larsen evidence shows that plaintiffs are no doubt technically correct in stating that the witness Larsen made no mention of the rates on coiled rods from Minnequa to Buffalo. However, an inspection of the evidence given by this witness does indicate that he was speaking of the general subject of rates from the western trunk line to official territory, on iron and steel articles, including billets and coiled rods. For instance, he says on pages 6 and 7

of his affidavit, which is part of this record, in analyzing plaintiffs' exhibits, that the only coiled rod rate in effect when most of plaintiffs' shipments moved was to Palmer; that the rate was put in to cover a plant-to-plant movement for the Colorado Fuel and Iron Corporation; that subsequently voluntary rates were put in to Roebling and Trenton, New Jersey and points in Ohio and Indiana. In context he was undoubtedly speaking of coiled rod rates and he indicates that these rates were below the maximum level and were put in to produce some long haul traffic in competition with eastern producers. The witness makes the statement that the coiled rod rates were so-called "missionary" rates and that figures indicate they are accomplishing their mission.

Plaintiffs point to the two special docket applications wherein reparation was awarded for shipments of coiled rods. The Commission in its decision mentioned these two reparation awards. In one the carriers sought and were authorized to pay awards. In one the carriers sought and were authorized to pay reparation on shipments of rods moved between September 2, 1950 and January 26, 1951 from Minnequa to Palmer to the basis of the rate established on January 29, 1951. The Commission says the average weight of the shipments was 113,811 pounds per car.

In the second case the carriers sought and were authorized to pay reparation on shipments of coiled rods from Minnequa to Buffalo, shipped between February 3 and June 5, 1951, to the level of the rate established on June 10, 1951. The average weight of these shipments was 96,206 pounds.

The two special docket reparation cases were based on an agreed statement of facts. The Commission action simply authorized reparation to shippers who had been charged at a higher initial rate than the rate subsequently established to be reasonable. The first special docket case is No. 222577. The application of the carrier stated that between September 2, 1950 and January 26, 1951, 170 carloads of coiled steel rods moved from Minnequa to Palmer. Prior to that time coiled rods were obtained in official territory. The application further recited that on September 1, 1950 it became impossible to obtain coiled rods in official territory; that carriers had not concluded their handling of the request for the establishment of a through rate on rods from Minnequa to Palmer and before the rate was approved and became effective, 170 carloads had been shipped. The carrier admitted in the application that the rate charged under the circumstances and conditions was excessive and unreasonable. The Commission order approved paying of reparation to the level of the established rate.

In general in the second case, special docket No. 223238, the same reasons were advanced by the carrier and the shipper. The shipments involved 74 cars of steel rods moving from Minnequa to Buffalo between February 3, 1951 and June 5, 1951.

From the two special docket applications which necessarily involved an admission by the railroads that the rates charged had been unreasonable, plaintiffs in the instant case argue that it must follow that the billet rate charged them is also unreasonable. However, it does not follow as a matter of law or even as a matter of unassailable argument that because the coiled rod rate is lower, then the billet rate must be found to be unreasonable and unjust under the circumstances presented in the instant case. In its decision, page 191, the Commission reviewed several of its previous decisions, prescribing rates on manufactured iron and steel articles. It examined its own records in Western Trunk Line Class Rates, 164 I.C.C. 1, where it prescribed rates on manufactured iron and steel articles between western trunk line territory and official territory on the basis of 32.5 percent of first class.

In American Steel Abrasives Co. v. Ann Arbor R. Co., 266 I.C.C. 505, rates on scrap iron were prescribed from the various western trunk line points to official territory. The Commission points

to the argument made by defendants that the basis of rates on billets in official territory does not set a limit beyond which interterritorial rates may not be maintained. The Commission points to the defendants' citation of the American Steel Abrasives Co. v. Ann Arbor R. Co. case where it is stated that 70 percent of the class 28 basis is about 10 percent higher than the basis prescribed on the same articles in official territory. And finally, the Commission mentioned and accepted defendants' argument that rates on the basis of 85 percent of either the class 28, class 29, or class 32.5 ratings are proper standards by which to measure the reasonableness of the rates assailed. The Commission finds that the 85 percent basis is midway between the iron and steel level and the scrap iron level, which corresponds approximately with the pricewise position of billets, namely, about halfway between the price of iron and steel articles and scrap iron.

In plaintiffs' recital of the Commission findings it has overlooked the Commission finding, page 192:

"* * * Excluding the Ex Parte No. 175 increase, rates on the same basis of 85 percent of class 29 are on approximately the same level as the rates charged; 85 percent of class 32.5 would result in rates approximately 10 percent higher than those charged; and the same percentage of class 29 produces rates 4 cents less than those charged."

■■ Plaintiffs have cited two decisions, United States v. Abilene & So. Ry. Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016 and Interstate Commerce Commission v. Louisville & Nash. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 as authority for the proposition that the Commission findings must be based on evidence of record before it. This court believes that the Commission complied with the holding in the cited cases. It acted on evidence. However, it must be conceded that the Commission had the right to take judicial notice of its own decisions on the same subject matter. From an examination of the whole record and the law, this court finds that plaintiffs have not sustained their burden. From the record of the Commission it appears, and this court finds, that the decision of the Commission is based on substantial evidence; that there is a rational basis in the record for the conclusions reached by the Commission; and that it has discharged its duty under the Interstate Commerce Act in that it has given full consideration to the contention of the plaintiffs and has applied the applicable law. The complaint will be dismissed.