The **BALTIMORE AND OHIO RAIL-ROAD COMPANY**, Bessemer and Lake Erie Railroad Company, Lehigh Valley Railroad Company, the New York Central Railroad Company, Norfolk and Western Railway Company, the Pennsylvania Railroad Company, the Pittsburgh & Lake Erie Railroad Company, Reading Company, Western Maryland Railway Company, Plaintiffs,

v.

The **UNITED STATES** of America and the Interstate Commerce Commission, Defendants,

and

Erie-Lackawanna Railroad Company, Intervening Defendant.

Civ. A. No. 65–348.

United States District Court
W. D. Pennsylvania.

Nov. 18, 1965.

Robert G. Boes, Cleveland, Ohio, Edward A. Kaier, Philadelphia, Pa., Rene J. Gunning, Albert W. Laisy, Baltimore, Md., Richard J. Murphy, Chicago, Ill., William P. Quinn, Philadelphia, Pa., Henry M. Wick, Jr., Delisi, Wick & Vuono, Pittsburgh, Pa., for plaintiffs.

Wm. H. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Gustave Diamond, U. S. Atty., Pittsburgh, Pa., Donald F. Turner, Asst. Atty. Gen., Robert W. Ginnane, Gen. Counsel, H. Neil Garson, Assoc. Gen. Counsel, Thomas H. Ploss, Interstate Commerce Comm., Washington, D. C., for defendants.

J. T. Clark, Gen. Atty., Erie-Lackawanna R. R. Co., Cleveland, Ohio, Ralph H. German, Houston, Cooper, Speer & German, Pittsburgh, Pa., for intervenor.

Before STALEY, Circuit Judge, and WILLSON and ROSENBERG, District Judges.

WILLSON, District Judge.

The complaint in this case was filed on March 31, 1965. This three-judge court was duly convened by an order of the Chief Judge of the Circuit. In the complaint it is stated that this civil action is one to enjoin, suspend, annul and set aside a report and order of the Interstate Commerce Commission in a proceeding before the Interstate Commerce Commission known as Investigation and Suspension Docket No. 8095, Iron Ore, Cleveland, Ohio, to Ohio and Pennsylvania, 323 I.C.C. 746. The proceeding before the Commission arose as a result of schedules filed by Erie-Lackawanna Railroad Company to become effective April 17, 1964, and later, in which it was proposed to establish multiple-car rates on iron ore from Cleveland, Ohio, to eight

destinations in Ohio and seven destinations in Pennsylvania.[1] The case was referred to Division 2 of the Commission. On January 28, 1965, it filed a report and order which was served on February 12, 1965, which is the final order of the Commission in this case, as a petition for reconsideration was in due course denied. Ten competing railroads protested Erie-Lackawanna's proposed new rate schedule. Nine of the same railroads are plaintiffs in this case. In effect the final order of the Commission vacated the previous suspension of the operation of the proposed rates and permitted the filing of a new tariff by Erie-Lackawanna which became effective April 1, 1965. In the complaint it is alleged that the jurisdiction in this Court is conferred by United States Code, Title 28, Sections 1336, 1398, 2284, and 2321 through 2325.

In accordance with the practice in this Court, the case was first presented to Judge Rosenberg. It is to be noticed that on March 31, 1965, the day before the effective date of the rates, Judge Rosenberg denied plaintiffs' application for temporary restraining order. Thereafter this civil action came on for hearing before this three-judge court. It is conceded that this Court has jurisdiction of the subject matter and of the parties. Counsel have been heard at oral argument, and their briefs have been duly considered. It is well at this point to emphasize that there is no dispute of any substance as to the factual background with respect to the evidence received by the Commission and with respect to the orders entered by the Commission. The contention is made, however, that the Commission acted without making proper findings, and that it erred as a matter of law in its conclusions.

■ Since 1916, all the railroads involved in this case have charged a uniform tariff on iron ore moving on their lines from Lake Erie ports southward to the steel mills in Ohio and Pennsylvania.

It is a matter of common knowledge that iron ore from the Mesabi Range is carried across the lakes by ore vessels to various docks on lower Lake Erie and thence by rail to the steel mills. A uniform tariff rate has been in effect since the order of the Commission entered in Iron Ore Rate Cases, 41 I.C.C. 181, (1916), 44 I.C.C. 368, (1917).

This uniformity in the rate schedule for iron ore moving southward by rail was upset when Erie-Lackawanna filed its new rate schedule on mutiple-car shipments. Single car shipments are not affected. The proposed rates are subject to a minimum of 10,000 gross tons per shipment, and, for each car, the marked capacity thereof. Each shipment must be tendered at one time and move from one consignor to one consignee. Upon protests being filed by ten railroads, the operation of the schedules was suspended until November 16, 1964, and voluntarily postponed thereafter until the final order of the Commission entered February 12, 1965. In a nutshell, the reduction in the rates filed by Erie-Lackawanna amounts to 20 cents a ton below the prior rates as most shipments as a matter of practice are necessarily over 10,000 gross tons.

The report of the Commission in this case, "Investigation and Suspension Docket No. 8095, Iron Ore, Cleveland, Ohio, to Ohio and Pennsylvania," 323 Interstate Commerce Commission Reports, pages 746 through 755, with two pages of appendices is in evidence.

It is to be noticed that no shipper or receiver of iron ore appeared before the Commission or filed a protest; it is well also to note that the plaintiffs before the Commission stipulated that the proposed rates are compensatory.

The report of the Commission on this point is as follows:

"At the hearing, the protestants stipulated on the record that the proposed rates are compensatory. Upon

1. Destinations: Girard, Hubbard, Leetonia, Mansfield, Niles, North Warren, Warren, and Youngstown, Ohio; Farrell, Franklin, Greenville, New Castle, Sharon, Sharpsville, and West Middlesex, Pa.

questioning of the examiner whether the rates met out-of-pocket costs or fully distributed costs, protestants replied: 'Whatever the proper cost standard is we will agree it is met by these rates.' Accordingly, the respondent did not present cost evidence in this proceeding." (p. 747).

Erie-Lackawanna has but one port facility on Lake Erie, and that is situate at Cleveland. Its proposal is to establish new multiple-car rates from Cleveland to the 15 destinations served by its own line. The Erie-Lackawanna has stated and the Commission has agreed that the purpose of the lower multiple-car rates is to place Erie-Lackawanna in a better position to compete for a greater portion of the decreasing volume of iron ore traffic transported in smaller vessels to Lake Erie ports, and thereby improve its financial condition. On evidence the Commission found that the volume of iron ore traffic is in general decreasing. All the railroads have suffered a decrease in this traffic, but on evidence the Commission found that Erie-Lackawanna suffered a greater decrease in proportion to other carriers because of various disadvantages involved. One main reason is because of the trend to larger ships since 1950. However, these newer and larger ore-carrying vessels are unable to navigate the Cuyahoga River and the tributary "Old River Bed" to the site of Erie-Lackawanna dock facilities.

The Commission concluded on evidence that Erie-Lackawanna is effectively barred from competing for the ore transported in such ships, and is confined to transporting only the ore from the smaller lake vessels, which are able to navigate the river to its docks. In this connection the Commission stated that: "Considering various disadvantages involved, such as dock limitations, the scheduling of ships, the bunching of vessels because of weather conditions, and the trend to larger ships, respondent nevertheless hopes to attract an additional million or more tons of ore under the proposed rates. This estimate is predicated upon an assumption that other railroads would not reduce the rates from their docks." (p. 748).

■ The Commission's decision favoring the low Erie-Lackawanna rates on ore is, we believe, based upon substantial evidence. This evidence as a whole supports the finding by the Commission that Erie-Lackawanna has over the years, due to its disadvantage in dock facilities, increasingly become handicapped in securing its share of the iron ore traffic. For instance, the tables in the appendix attached to the Commission's report show significant declines in the shipments of iron ore handled by the railroads from 1947 to 1963. All the roads lost business. However, Erie-Lackawanna has suffered a greater decline than the other railroads. Table 1-A and Table 2 give the index figures. The average of 1947 through 1949 is 100. Based on the computation made by the Commission for 1961–63, Erie-Lackawanna's index figure was 43; whereas Baltimore & Ohio was 84; Chesapeake & Ohio, 103; New York Central, 78; Nickel Plate, 70, and Pennsylvania, 52. Under Table 2, in 1963, the index for all roads was 52. Thus, for the years cited in the report, Erie-Lackawanna has a greater decline except for the Bessemer & Lake Erie Railroad.

The evidence just mentioned which the Commission received and relied on in making its basic findings is briefly summarized as follows. At the hearing before the Commission, Erie-Lackawanna produced John S. Parsons, its chief engineer who gave testimony concerning the physical characteristics of that part of the Cleveland Harbor relevant to Erie-Lackawanna's ore unloading operations; that the length of the largest ship which could navigate the existing channel to its dock was 631 feet; that its dock could not handle ships of more than 700 feet in length; and that funds were not available for drastic improvements to the facilities necessary to accommodate the larger vessels.

Joseph G. Wood, vice president and manager of operations of an independent Great Lakes steamship company testified on behalf of Erie-Lackawanna that the

trend in shipbuilding and use is toward vessels 730 feet in length, and that use of the Erie-Lackawanna dock, even by smaller ships, requires more tug assistance than other railroad docks, with attendant increased costs due to tug charges, including time spent waiting for available tugs.

M. F. Coffman, director of business and market research and cost analysis for Erie-Lackawanna, testified to decline in its traffic, revenue, and net income.

E. T. Butler, freight traffic manager for Erie-Lackawanna, testified to the relationship of the proposed rate reductions to rate reductions allowed in other commodities, to the decline in volume of iron ore unloaded by Erie-Lackawanna at its Cleveland dock, the comparison of this decline in volume with the volume handled elsewhere, and the reasons that Erie-Lackawanna felt required the rate reductions, namely, the hope of attracting a million additional tons of ore annually, and the increased total revenues resulting therefrom.

The protesting railroads before the Commission offered the testimony of five witnesses. These witnesses generally speaking testified as to the effect of the proposed Erie-Lackawanna rates on the general rate structure of the other railroads.

For instance, plaintiffs' first witness was W. R. Noll, manager of pricing of coal and ore of the New York Central Railroad, who testified to the amount of iron ore carried annually by the plaintiffs and the revenue derived therefrom, that the largest movement of iron ore by United States railroads takes place between lower Lake Erie ports and the interior, and that reductions in rates, if initiated by Erie-Lackawanna, would of necessity be required of the other railroads, with the result that corresponding losses of revenue would severely affect the financial condition of the plaintiffs; that the Erie-Lackawanna rates would apply not only from its own dock, but from private docks as well and thus increase the competitive pressure on the plaintiffs to reduce their rates; that no increase in volume could be anticipated by plaintiffs even with rate reduction, so that they would be performing the same services for less revenue, a situation not advisable in view of an already low rate of return of the New York Central; that if plaintiffs' rates were not reduced, they would lose business.

E. P. Cilley, the general freight traffic manager of the New York, Chicago and St. Louis Railroad Company (Nickel Plate), testified that in his opinion Erie-Lackawanna's relative share of all ore hauled from Lake Erie ports has not declined; moreover, that Nickel Plate's dock is not without disadvantages to the maritime user, and that any reduction in rates would result in serious loss of revenue.

R. B. Bockmiller, general freight agent of the system rate bureau of the marketing department of the Baltimore & Ohio Railroad Company, testified that hauling iron ore is an important source of revenue to his railroad, that his railroad would be forced to meet the rate reductions of Erie-Lackawanna with similar reductions, and for example, would lose thereby revenues of some $760,000.00 annually.

Miles Clipsham, chief cost analyst of the Baltimore & Ohio Railroad, testified that Erie-Lackawanna's operating revenues, relative to the operating revenues of all Eastern District railroads, have remained virtually constant.

The final protestant witness was A. L. Graburn, the manager of coal traffic sales and rates, of the Pennsylvania Railroad Company, who testified that iron ore accounts for 5.6 percent of that road's revenues; that Erie-Lackawanna had exhibited willingness to join connections with other carriers in the same rate reduction in line haul rates from other Lake Erie ports to destinations where it was a participating carrier in the present rates; that destinations covered by the reduced rates were served by plaintiffs also; that plaintiffs would be required to match Erie-Lackawanna's reductions or lose business; that the effects of the rate reduction would be felt outside the area

served by Erie-Lackawanna in that the existing relationship between import rates and ex-lake rates and between Atlantic Coast shipments and St. Lawrence Seaway-lake shipments would be disturbed; that plaintiffs would therefore be forced to reduce rates in their other ore movements, (all-rail and import); that the present rates already produce nearly the lowest car-mile earnings; that the decline in ex-lake iron ore traffic was general; that most vessels in operation were of a size which could be handled at the Erie-Lackawanna Dock; and that there were other docks of equal or smaller size along Lake Erie.

The evidence supports the finding by the Commission that the new and larger boats cannot reach the Erie-Lackawanna Dock because of reverse bends and other impediments in the river channel between the lake harbor entrance and the dock. Even with the proposed widening of the channel under construction by the Army Corps of Engineers, Erie-Lackawanna could not accommodate 730-foot ore boats until its unloading dock is extended and the bulkhead reconstructed to allow dredging and deepening of the channel from 23 feet to 27 feet. Funds estimated at $1,653,000.00 for this construction are not presently available.

The evidence also supports the finding that Erie-Lackawanna labors under an additional handicap with respect to its docking facilities in that an ore vessel requires two tugboats because of the navigation problem in reaching its dock. The Commission found that tugboat assistance is seldom required to reach other competing Lake Erie railroad docks.

The Commission found, in short, that Erie-Lackawanna operated under disadvantages in competing for carriage of iron ore; that the proposed new rate was compensatory; and that so long as the proposed rate was not above the reasonable maximum nor below the reasonable minimum, the management of Erie-Lackawanna was at liberty to adjust the rate within that range. It concluded that the new rates were within the zone of reasonableness, and that the carrier was authorized to "adopt such policy of ratemaking as to it seems best, absent a violation of some provision of the act. We do not sit in judgment of the wisdom of carriers' proposals, but only whether or not they would be lawful in terms of the regulatory statute." (p. 753).

In summary at this point, the evidence before the Commission was that one of eleven carriers, due to physical disadvantages and handicaps in its facilities, has suffered a disproportionate decline in revenue as compared to the other carriers. By its new rate it hopes to become again competitive, but it cannot attract more than its traditional share of business even considering the new rate because of the physical limitations in its facilities. As indicated, this conclusion of the Commission is in the judgment of this Court based on substantial evidence.

Plaintiffs' whole case against the Commission is succinctly stated on page 7 of their brief where it is said:

"This decision holds that in intramode * * * rail cases, the Commission's inquiry into the lawfulness of rates is completed once it is found, or the parties stipulate, merely that the rates are compensatory. In this case, the Commission abandoned its power and long-recognized duty, under §§ 1–15a(2), (Interstate Commerce Act (49 U.S.C. §§ 1–15a(2)) and the national transportation policy, of preventing harmful dissipation of rail carrier revenues caused by reduction of reasonable rates. The report of the Commission did not even mention the long line of cases dealing with the Commission's duty under §§ 1 and 15a(2) or attempt to explain why it disregarded statutory and case law consistently applied by the Commission and the courts to rail intramode competition for over 40 years."

Plaintiffs charge the Commission with error of law in their brief on page 7 where they say:

"In reaching its conclusions, * * * relied on a number of cases involv-

ing intermode * * * competition arising under § 15a(3) (49 U.S.C. § 15(3)) added by the Transportation Act of 1958, which has no application when respondent and protestants are railroads, rather than on controlling intramode rail cases arising under §§ 1, 15a(2) and the national transportation policy (753, 754)."

Section 1(5) of the Interstate Commerce Act requires that all charges be "just and reasonable"; section 15a(2) directs the Commission, in prescribing such rates, to consider the railroad's need for sufficient revenues to provide adequate service; and the national transportation policy (preceding section 1) requires the promotion of adequate, economical and efficient service and the establishment of reasonable charges for such service without destructive competitive practices.

█ The Commission's report and order should stand unless on review we conclude that the Commission has misapplied the law. In examining this question, several principles are to be considered. Judicial review of administrative agency action is limited by the Administrative Procedure Act, (5 U.S.C. § 1001 et seq.) at section 1009(e), to consideration of " * * * all relevant questions of law, * * * constitutional and statutory provisions, and * * * the meaning or applicability of the terms of any agency action." A court can " * * * set aside agency action * * found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

The Supreme Court has defined the scope of judicial authority to review agency decisions. In Mississippi Valley Barge Line v. United States, 292 U.S. 282, at page 286, 54 S.Ct. 692, at page 693, 78 L.Ed. 1260 (1934), an I.C.C. rate case, the Supreme Court stated:

"The settled rule is that the findings of the Commission may not be assailed upon appeal in the absence of the evidence upon which they were made."

█ Further it is uncontroverted but what the decision of the Commission carries the presumption of validity. See Waite v. United States, D.C., 161 F. Supp. 856, (1958), and Koppers Company, Inc. v. United States, D.C., 166 F.Supp. 96, (1958). With the foregoing principles in mind, it is well to note that in the rate case mentioned above, Mississippi Valley Barge Line v. United States, the Supreme Court stated:

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the commission by training and experience is qualified to form. (Citing case). It is not the province of a court to absorb this function to itself. (Citing cases). The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

As stated above, plaintiffs charge that the Commission, in reaching its decision, erred as a matter of law in three instances: first, in failing to follow sections 1(5), 15a(2) and the national transportation policy preceding section 1 of the Interstate Commerce Act; second, in following section 15a(3); and lastly, in failing to make required findings of fact. An examination of the statute, the cases, the record and the report, demonstrates the error of plaintiffs' contention. In attempting to justify their position and thus defeat Erie-Lackawanna's proposed rate reductions, the plaintiffs have relied on the authority of decisions which although germane are not controlling. In support of their position, plaintiffs in some instances have made partial quotations from the Commission's report and in others have overlooked the plain language of the report.

The answer to the plaintiffs' first contention, that the Commission failed to follow sections 1(5), 15a(2) and the national transportation policy, is found

in the Commission's report at page 753: "The factors referred to in that section [15a(2)] are related to those set forth in the national transportation policy and *have been considered in connection with protestants' contention that the proposal threatens the existing rate structure on iron ore and is therefore a destructive competitive practice prohibited by the national transportation policy.*" [Emphasis supplied].

On brief, plaintiffs argue that if section 15a(2) had been followed, the cases decided thereunder, notably Trunkline & Ex-Lake Iron Ore Rates, 69 I.C.C. 589, (1922), and Iron Ore Rate Cases, (1916) would have compelled the Commission to disallow the proposed reduced rates. The decisions cited might support a conclusion contrary to that of the Commission in the instant case, but they do not compel such a result. The Commission's report itself gives a reason why the earlier decisions are not controlling in that the cases are distinguishable on their facts; for instance, the Iron Ore Rate Cases made no mention of the inaccessibility of dock facilities.

The Commission restated the standards set out in the Milwaukee case, United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023, (1935), namely that when rates are not above the reasonable maximum, nor below the reasonable minimum, a carrier is at liberty to adjust them within this range, although it cannot be required to do so by the Commission. The Commission went on to state that the rates of Erie-Lackawanna are within that zone of reasonableness. The Commission noted that the definition of "destructive competitive practice" does not appear in the national transportation policy or elsewhere in the Act, and observed, after discussion, that where a rate is compensatory, there is no basis for a finding that it contravenes the national transportation policy. But that statement must be read in the light of the fact that the Commission had already found that because of the physical limitations on Erie-Lackawanna dock facilities, the amount of iron ore traffic which it could divert from the other railroads would necessarily be likewise limited and that the plaintiffs, therefore, would not be required to counter the corresponding reductions in rates. The Commission concluded that on the basis of the evidence the action of Erie-Lackawanna was not a destructive competitive practice, and therefore not in violation of the national transportation policy.

■ Thus, it must be held that plaintiffs' contention that the Commission failed to consider section 15a(2) and the national transportation policy is without merit.

■ The plaintiffs' second contention, that the Commission relied on section 15a(3) in arriving at its decision in the instant case, is based upon the fact that the Commission, in its discussion of "destructive competitive practice", cited cases involving intermodal competition and the application of section 15a(3). Further, plaintiffs contend that in so relying upon section 15a(3), the Commission treated that section as modifying the law applicable in rail intramode rate cases. But the legislative history of the 1958 Amendment which introduced section 15a(3) into the Act and the cases decided under this section, notably the New Haven case, I.C.C. v. New York, N. H. & H. R. Co., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108, (1963), and Cooper-Jarrett, Inc. v. United States, D.C., 226 F.Supp. 318, (W.D.Mo.1964), affirmed per curiam, 379 U.S. 6, 85 S.Ct. 49, 13 L.Ed.2d 21, (1964), show that section 15a(3) was intended to apply to intermodal competition. However, it is to be noted that the point in its report at which the Commission cited section 15a (3) cases was in its discussion of "destructive competitive practice." The term "destructive competitive practice" is one found in the national transportation policy, which by its express language is made applicable to all other provisions of the Act. The Commission frankly stated in its discussion of "destructive competitive practice" that "The

recent cases dealing with this question have primarily involved intermodal competition, but several criteria have evolved which are relevant to the disposition of this proceeding." (p. 753).

A review of the decisions cited does not convince us that the Commission applied an improper section of a statute merely because it discussed the criteria to be considered in determining "destructive competitive practice." This Court is not disposed to find that in the circumstances here presented the Commission applied section 15a(3) to the present controversy.

Plaintiffs strongly contend that the effect of the order is to bring on a rate war between the protesting carriers and Erie-Lackawanna. But this suggestion is to some extent negated by the Commission with the inference that it will handle such a rate war upon its arising; and in effect none has occurred with the rates being in effect during one entire lake shipping season.

And finally, the plaintiffs say that the Commission has not made adequate findings in support of its decision. We disagree. It appears from the record that the Commission's order has adequate support in the evidence before the Commission, and that the Commission has found that the rates, being compensatory and not destructive, are reasonable and not a violation of sections 1(5) and 15a(2), and of the national transportation policy as set forth in the statute.

The Commission heard the issues presented by the protestants, it received evidence, and made findings and reached a conclusion. It is true that the Commission has not made its findings in seriatim form, but its findings appear in the report, as do its conclusions of law. We do not find the legal conclusions of the Commission to be erroneous. We affirmatively find that the Commission's legal conclusions are ones permitted by the evidence which it received. We say to the Commission, as it said to the carriers, we do not sit in judgment on the wisdom of the Commission's re-

sults, but only as to whether or not its decision is based on substantial evidence, and whether it is within the terms of the regulatory statutes. We find the Commission's decision in this case to be lawful in all respects. The complaint must therefore be dismissed. It will be so ordered.